874 So.2d 1131 (2002)
Antywan Develle WILSON
v.
STATE of Alabama.
CR-00-1003.
Court of Criminal Appeals of Alabama.
April 26, 2002.
Rehearing Denied September 20, 2002.
*1132 Henry L. Penick, Birmingham, for appellant.
William H. Pryor, Jr., atty. gen., and Sandra J. Stewart and Michael B. Billingsley, asst. attys. gen., for appellee.
COBB, Judge.
On August 7, 1998, Antywan Develle Wilson was indicted by a Jefferson County grand jury for first-degree robbery, a violation of § 13A-8-41, Ala.Code 1975, and for attempted murder, a violation of §§ 13A-4-2 and 13A-6-2, Ala.Code 1975. Wilson's case was consolidated with that of Trumaine Arrington, who was charged with the same crimes against the same victim. On November 11, 1998, Wilson served the Jefferson County district attorney with a motion to produce or disclose any information and documents exculpatory to this case. On March 4, 2000, the district attorney responded to Wilson's discovery request, but did not produce statements from the victim, the defendants, or witnesses. On March 15, 2000, Wilson communicated to the district attorney's office that the production "conspicuously lacked statements from the victim, the defendants, or any witnesses." (C. 111.) The district attorney did not produce the additional exculpatory material requested by Wilson. The case was tried on April 18, 2000, but ended in a mistrial when the jury was unable to reach a verdict.
Wilson's second trial, also consolidated with Arrington's, began on November 6, 2000. During this trial, Wilson made a motion for a mistrial when he discovered that the district attorney had failed to produce certain exculpatory material that indicated that three witnesses had identified someone other than Wilson and Arrington as the perpetrators. Although his motion for a mistrial was denied, the trial judge agreed that the evidence was exculpatory and that it should have been produced, and allowed Wilson to question Detective Cory Hardiman about the witnesses' identifications of two other men as the perpetrators.
On November 8, 2000, Wilson was convicted of first-degree robbery and attempted murder.[1] On January 26, 2001, Wilson was sentenced to 30 years in prison for the robbery conviction, and to 30 years in prison for the attempted-murder conviction. Those sentences were to run concurrently. Wilson filed a notice of appeal as to both convictions that same day. On February 26, 2001, Wilson filed a "motion for judgment of acquittal or in the alternative for new trial or arrest of judgment" for both convictions. (C. 80-81.) The trial court denied the motion on April 12, 2001. This appeal followed.
*1133 On January 20, 1998, between 9:00 p.m. and 11:00 p.m., Willie Hamilton was walking in the Gate City housing project in Birmingham. Hamilton was a resident of the housing project. Hamilton had with him a box of children's clothes he was trying to sell. Hamilton approached two men and asked if they were interested in purchasing the clothes. One of the men asked to see the clothes, and then put the box in the trunk of his car. Hamilton demanded that the men either return the clothes or pay for them. One of the men, using a profane phrase, told Hamilton to go away. When Hamilton refused to leave without the clothes, the two men huddled together for a brief period, and then one of the men shot Hamilton five times.
Wilson and Arrington were apprehended within an hour of the shooting, approximately one block from the scene, driving a car matching a description of the suspects' car. Arrington was taken into custody at that time for unrelated offenses, but Wilson was released at the scene. Wilson later went to the police station and answered additional questions. Approximately two weeks after this questioning, Wilson was taken into custody. In a pretrial photographic lineup, and in open court, Hamilton identified Wilson as the shooter and Arrington as the man who was with Wilson on the date of the incident.
On appeal, Wilson argues that the trial court erroneously denied his motion for a mistrial when the prosecutor failed to produce exculpatory evidence. Specifically, Wilson contends that he was entitled to a mistrial because, he says, the prosecutor failed to produce Detective Hardiman's case notes that contained statements given by three witnesses, in which the three witnesses identified someone other than the defendants as the assailants.[2] We agree.
"A mistrial is a drastic remedy that should be used sparingly and only to prevent manifest injustice." Hammonds v. State, 777 So.2d 750, 767 (Ala.Crim.App. 1999). A mistrial is the appropriate remedy when a fundamental error in a trial vitiates its result. Levett v. State, 593 So.2d 130, 135 (Ala.Crim.App.1991). The granting of a mistrial is addressed to the broad discretion of the trial judge, and his ruling in that regard will not be reversed on appeal unless it clearly appears that the court abused its discretion. Grimsley v. State, 678 So.2d 1197, 1206 (Ala.Crim.App. 1996), citing Chillous v. State, 405 So.2d 58 (Ala.Crim.App.1981).
The principles announced in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), are violated when the prosecutor suppresses material evidence favorable to the defendant. Hardy v. State, 804 So.2d 247, 285 (Ala.Crim.App. 1999), aff'd, 804 So.2d 298 (Ala.2000). Evidence is material if there is a reasonable probability that the outcome of the trial would have been different if the evidence had been disclosed prior to trial. Id.
At Wilson's first trial, Detective Hardiman testified that three witnesses he interviewed at the scene of the shooting did not identify anyone. Because we do not have the transcript from the first trial, it is unclear exactly what Detective Hardiman *1134 was testifying to in the first trial. The State contends that the detective was testifying that the three witnesses did not identify anyone from a photographic lineup, while Wilson contends that the statement meant they did not identify anyone at any time.
Regardless of what Detective Hardiman was testifying to in the first trial, nothing in the record before us gives any indication that his testimony should have lead a reasonable person to believe that the three witnesses had identified "B" and "Bouty Bouty" as the assailants. The first trial resulted in a hung jury, and the trial court declared a mistrial and ordered a second trial.
On November 11, 1998, Wilson, in his discovery motion, requested that the State produce any Brady material and any exculpatory evidence. On March 4, 2000, the prosecutor provided Wilson with some discovery material, but did not include any witness statements or any incident reports or notes made by investigating officers. On March 15, 2000, Wilson again requested any police reports or statements from the defendants, victim, or witnesses. Wilson did receive a police report that contained the names of the three witnesses. The prosecutor also provided a copy of the incident report to Arrington, but not to Wilson. However, nothing in the incident report offered any indication that any of the three witnesses had identified someone other than Wilson and Arrington as the perpetrators.
At Wilson's second trial, Officer Michael Johnson testified that Hamilton indicated that the two black males who had shot and robbed him had come from a building later identified as 6822 Kimberley Avenue. Officer Johnson identified Wilson's exhibit 1 as a standard police incident report that he had written following this incident. That report contained the following summary of statements given by witnesses and the victim:
"Officers received a call on a signal `13' with a person shot at the listed location. Officers arrived at the scene and found the victim lying in the middle of the street. The victim was coherent and told officers that two black males exited the residence of 6822 Kimberly Ave. Victim further stated that the two black males approached him and shot him for reasons unknown. B'ham Fire and Rescue # 12 arrived on the scene. Fire and Rescue told officers that the victim had gunshot wounds to his left thigh and ankle; and a gunshot wound to the left side of his abdomen with an exit wound on the right side of his buttocks. The victim was transferred to University Hospital where he is listed in critical condition.
"Witnesses stated that they were present inside the residence of 6822 Kimberly Ave. when two black males started knocking on the door of the residence. The two black males were demanding to use the phone inside of the residence. Witnesses told the two black males that they could not use the phone. The two black males left the residence and confronted the victim in the street."
(CR. 106-08; CR. 153-55.)[3] Officer Johnson testified that he spoke with Dalanda Bryant, Akia Julius, and Telisha Hickman, and other individuals whose names he was unable to ascertain. Bryant, Julius, and Hickman were inside the residence at 6822 Kimberly Avenue when the shooting occurred.
*1135 Officer Anthony Wallace testified that he also questioned three females at 6822 Kimberly Avenue and that he joined in Officer Johnson's incident report. Officer Wallace stated that he went back to 6822 Kimberly Avenue approximately one hour later to obtain additional information from the three females, but there was no answer when he knocked on the door.
Detective Cory Hardiman testified that Hamilton identified Wilson as the man who shot him. Detective Hardiman also testified that Richard Shields, another witness, identified Arrington.[4]
During cross-examination of Detective Hardiman, the following exchange occurred:
"Mr. Penick [Wilson's counsel]: Did you take notes when you interviewed the three ladies, Dalanda Bryant, Akia Julius and Telisha Hickman? Did you take notes when you interviewed them?
"[Detective Hardiman]: Yes, sir.
"[Mr. Penick]: Do you have those notes here with you today?
"[Detective Hardiman]: Yes, sir.
"Mr. Penick: Could you produce those notes?
"[Detective Hardiman]: Yes, sir.
"Mr. Penick: Judge, we would ask that those notes be produced pursuant to our request for production.
"The Court: We'll take that up later. Let's move on."
(R. 297.)
Detective Hardiman testified that three witnesses told him "B" and "Bouty Bouty" from Bessemer were involved in the shooting. Hamilton told him "Coon Dog" was involved, and another person told him "Twan" was involved.[5] Detective Hardiman was unable to locate anyone who went by the street names "B" or "Bouty Bouty."
"The names that I was given, Coon Dog and Twan, I followed up and was given the names of individuals that went by those street names. The names of B and Bouty Bouty, I was never able to find anybody who said they knew those two people, let alone what their names were. The names I was given belonging to Coon Dog and Twan, I identified as being one of the two defendant, or I did a lineup and showed Mr. Hamilton."
(R. 307.) Detective Hardiman later stated that it could have been another police officer who told him about "Twan."
The trial court then excused the jury, and the following exchange occurred:
"The Court: Mr. Penick, what is it about the notes you wanted?
"Mr. Penick: Judge, we sent a request for production in this case, the standard request, and asked that they produce all written records and notes that might be exculpatory in this case, certainly exculpatory relating to Mr. Wilson. And if Detective Hardiman interviewed witnesses, and he was writing down what they said, and taking notes of their statements, and those two or three people told him that the shooter, or the guys involved in the shooting were B and Bouty Bouty, we should have had *1136 access to that as part of our discovery. That definitely would be exculpatory.
"The Court: Let's look and see what the notes say. Do you have those notes?
". . . .
"The Court: I read hers. No, I didn't. Let's see. I don't see anything in those notes that's not already in front of this jury. You are welcome to look at them."
(R. 313-15.)
According to the notes, on the night of the shooting, Dalanda Bryant made the following statement:
"The two people at her house were `B' and `Bowdy Bowdy' from Bessemer. They were driving a burgundy Grand Prix. As they were leaving her house the [victim] was walking up. They had been at the house twenty minutes."
(CR.104.) Telisha Hickman gave the following statement:
"The guy who walked up [was] trying to sell something. That guy was shot. `B' shot him. Bowdy-Bowdy was just looking. Bowdy-Bowdy drove. They took clothes from the man as they left."
(CR.104.)[6] Detective Hardiman's notes indicate that Akia Julius was upstairs looking out the window when the men left the apartment, and she gave the following statement:
"`B' and `Bowdy-Bowdy' were at the house for about 20 minutes. The man approached them as they walked out the door. The man was acting smart with them. On the way downstairs she heard the gunshots. They drove away in a burgundy car."
(CR.104.)
The in camera discussion continued after the trial judge reviewed Detective Hardiman's notes.
"Mr. Spencer [Arrington's counsel]: Judge, we made a discovery request as well some time ago, and the only thing we got was information regarding the photo lineups, which we talked about.
"The Court: Let me ask you this. You got that police report with those three names in it; didn't you?
"Mr. Penick: Those three ladies' names, yes.
"The Court: That's the three ladies that's contained in the notes.
"Mr. Penick: Your Honor,
"The Court: Let me finish. We've been through this once, a trial, none of those three ladies came in and testified and identified anybody. As far as I know, neither side has subpoenaed them. According to the records, neither side has subpoenaed them. I assume you've known since the first trial that these ladies haven't identified this defendant. Now, it's come out that they say some persons by the name of B and Bouty Bouty did the shooting. Have you subpoenaed any of those three ladies, Mr. Spencer, Mr. Penick?
"Mr. Penick: Yes.
"The Court: Do you intend to call them, ask them and put them on the witness stand?
"Mr. Penick: If we can get them here, Judge, we will.
". . . .
"The Court: You've known since the first trial these three women haven't identified these defendants, right?
"Mr. Penick: No.

*1137 "The Court: Well, their names are on there. They didn't testify in the first trial. It's pretty obvious to me that you had to know they have not identified these defendants or they would be on the witness stand, or else they are unable
"Mr. Penick: Well, Judge, I think they are unable.
"The Court: I don't know if they are or not. I'm just saying I don't think there is anything in those notes that hasn't already come out in front of this jury.
"Mr. Penick: Judge, let me say this.
"The Court: Make them a copy of those notes, [Bailiff], and give them a copy of those notes that deals with those three people. I'll let you ask Mr. Hardiman anything you want to that you haven't already asked him.
"Mr. Penick: I want to say on the record, Judge, that those witnesses certainly are no longer at 6822 Kimberly Avenue where they were.
". . . .
"Mr. Penick: Just so my representation to the Court will be entirely correct, yes, sir, I did talk to Dalanda Smithher name is Smith instead of Bryant. That's another reason we couldn't find her.
". . . .
"Mr. Penick: So yeah, Judge, I talked to Dalanda Smith and we are trying to get her here to trial. That's all I can say.
"The Court: Well, I don't see anything exculpatory there that you didn't already know.
"Mr. Penick: I would like to see what it says.
"The Court: We are going to give it to you and you can certainly ask Detective Hardiman anything you want. I'm telling you, that information you've already asked him about, the jury has already heard that, but you can ask him as many times as you want to.
". . . .
"The Court: Give Detective Hardiman his original notes and give Mr. Penick and Mr. Spencer a copy of those notes, please. We'll give you a moment to look over those. Have you seen them, Mr. Felton?
"Mr. Felton: No, sir.
"The Court: You can look at the originals since we've given them back to Mr. Hardiman.
"Mr. Felton: I know what they said based on the summary I gave to them, so.
"The Court: Based on the summary, what do you mean `the summary'?
"Mr. Felton: Detective Hardiman was kind enough to give us a summary of everybody he talked to, and I gave it to the defense attorneys.
"Mr. Penick: I don't think we have a summary, do we?
"Mr. Felton: You should have it. I guess now he's saying he lost it.
"Mr. Penick: No. Judge, we've got a list of everything he gave us, and I don't see anything about a summary on it. This is under the signature of Mr. Brad Felton, Your Honor.
"Mr. Felton: I don't want that.
"Mr. Penick: I'll show it to His Honor, then.
"The Court: Let me see it.
"(Documents passed.)
"Mr. Penick: While we are at it, Judge, let me show you a couple of other letters. That's a list of what he produced. I would like to have these two letters marked as exhibits in the trial.
"The Court: Have you looked at these, Mr. Felton?
"Mr. Felton: Yes, sir. I sent them.

*1138 "The Court: Do you wish to look at them is what I'm asking?
"Mr. Felton: No, sir.
"The Court: Well, I don't see in your list of discovery provided any summaries of anything. The only thing listed is 19 items, and every one of them basically says copy of photographic lineups or admonitions about lineups. There is nothingthere is a copy of the Birmingham Police Department Miranda rights form signed by Trumaine Arrington and Antywan Wilson, and a copy of the Birmingham Police Department incident offense report, three pages, in your letter dated March 20, 1999. That's the only thing listed by you as those items furnished to the defendants.
"Then we have a letter from Mr. Penick dated March 15, 2000 apparently in response, well, his letter is dated prior to your letter.
"Mr. Spencer: One is my request that Mr. Felton responded to and sent the basic photo lineup information that I think Mr. Penick has.
"The Court: Right. The first letter is addressed to Mr. Spencer. Then there is a letter dated March 15th from Mr. Penick, apparently, I guess, in response to something sent to you. Did you get a letter similar to this, Mr. Penick?
"Mr. Penick: Yeah. I got a letter itemizing what was being sent.
"The Court: Let me see your letter that you got.
"Mr. Penick: March 4. It's the same letter.
"The Court: Well, it appears to be basically the same letter except it lists 18 instead of 19 like Mr. Spencer's. The only thing missing from yours is apparently the Birmingham police report incident offense report of three pages. So the letters are the same.
"Then we have a letter from Mr. Penick back to Mr. Felton saying the response didn't include any statements from the victim, the defendants or any witnesses to this case. `Please review your file and provide copies of all statements, requests 3, 4, and 11, as well as any police reports, request 9, and any other documents or photographs which you intend to use at trial.'
"Then we have a letter back from Mr. Felton basically saying, Please come see me. I don't know whether either of you went to see him or not.
"Mr. Felton: I met with Mr. Spencer, I know. I've tried to meet with Mr. Penick before and he never comes to my office. I know I met with Mr. Spencer and showed him my whole file and everything we had, which I do on every case.
"The Court: Is that true, Mr. Spencer?
"Mr. Spencer: Judge, I don't recall hearing about these notes from Detective Hardiman. Now, what I have in my file is regarding the photo lineups and police reports. In actuality regarding the questioning earlier about the leads, that was based on the information from his background.
"The Court: I mean obviously they are exculpatory because they say somebody else did the shooting, whoever B and Bouty Bouty happen to be, and they should have been disclosed to the defendant. However, that information is before this jury.
". . . .
"The Court: Your letters certainly don't indicate that that information was turned over to them because your letter simply lists the photographic lineups, the admonitions that were signed by the witnesses that did the identification, or were shown to, and on one letter you indicate a three-page incident offense *1139 report was provided, and that's it. Now, I have to assume from that that it was not provided.
". . . .
"The Court: Haven't you got the best of both worlds at this point, Mr. Penick and Mr. Spencer? You've gotten out that these people identified B and Bouty Bouty as the people that did the shooting, but yet you don't have to have them up here to be cross-examined by the state? Don't you have the best of both worlds at this point?
"Mr. Penick: I will say this, Judge. I only learned about the B and Bouty Bouty thing today.
"The Court: You didn't answer my question, though. Don't you
"Mr. Spencer: I don't know if that's the best of both worlds or not, Your Honor. I thinkit's whose perspective you are in and the outcome of this case.
"The Court: What do y'all expect me to do? What are you asking me to do?
"Mr. Spencer: Well, if the Court so finds that the information isif the Court deems that as exculpatory, then I would ask the Courtand that information wasn't provided as it should have been, then I would ask the Court to dismiss this case.
"The Court: That is not going to happen.
"Mr. Penick: We would ask the Court for a mistral then."
(R. 315-24.)
The trial court took a recess to read caselaw on the subject. After the recess, the following occurred:
"The Court: [C. Gamble, McElroy's Alabama Evidence § 290.05(1)] says that in order to be reversible error it must appear that the defense, first of all, made a request for the undisclosed evidence. I assume that's been done. Is there any dispute about that, Mr. Felton?
"Mr. Felton: I don't remember what they requested. I made available my file.
"The Court: I assume they asked for any exculpatory evidence in their discovery request. Whether theyRoman Numeral II, Brady material, any and all material which is in the possession of or known to the prosecution, police or governmental agency which would negate the charge against the defendant, lead to a reasonable doubt, etc. and it goes on and on and lists a whole string of things considered exculpatory. So it's apparent they made the request.
"`The evidence suppressed must have been material, probative, vital and exculpatory to the accused.'
"The fact that two witnesses have identified someone other than the accused in this case as being the perpetrators is obviously exculpatory. I don't know how you could view it in any other way.
"Then the next element is that if the evidence undisclosed could have in any reasonable likelihood have affected the judgment of the jurythat's citing Brady v. Marylandand that has to be evaluated in the light of the entire record.
"So it's reversible error for meyou know, if there is a conviction in this case, it's very likely it could be held to be reversible error.
"The only question I have is whether having this information in advance would have substantially affected the judgment of the jury in this case. I'm not sure that it would. The jury has already heard testimony that these two people were at least identified by three witnesses *1140 as the perpetrators. They've heard that evidence.
"I'm going to allow the defendants to cross-examine Detective Hardiman about those notes he was given because I think not to do so puts me in a position of having to declare a mistrial, quite frankly.
". . . .
"The Court: My question is if Mr. Felton didn't tell you about it, how did you find out about it because you certainly were aware of itor at least Mr. Penick did.
". . . .
"Mr. Penick: I'm saying I learned about that an hour before I asked the detective that information. I learned that from talking to Ms. Smith. Her name is not Dalanda Bryant, as it shows on all the paperwork I had, or that I had gotten from whatever source.
"Only thing I'm saying is, we didn't know anything about B and Bouty Bouty until one hour ago. This is the second trial and we are halfway through the second trial.
"My letter to Mr. Felton was to try and clear up that because it was so obvious that we had no statements from any of the witnesses.
"The Court: Mr. Felton, even though you feel like you may have given this information to them, it would seem to meI don't remember any of this information coming up in the first trial about B or Bouty Bouty, which would tend to corroborate what Mr. Penick says that he only learned of it a very, very short time ago. Otherwise, I'm sure as good a lawyer as Mr. Penick is, he would be up here jumping up and down wanting to know, you know, where are these notes and why haven't I been given them before now.
"I'm notthe issue, and you have to understand the caselaw in this case, is very explicit. The subjective intent of the prosecutor is irrelevant, whether it was intentional or unintentional, an honest mistake or an oversight is irrelevant under the caselaw. In fact, they specifically say that the prosecutorthe prosecutor's subjective intent is irrelevant, if I can find it real quick.
"`A conviction obtained when such evidence has been suppressed is to be overturned irrespective of the good or bad faith of the prosecution as long as the evidence was exculpatory to the accused. It has been said that the question of whether the defendant's rights protected by due process are violated by denial of the accused's motion for pre-trial production of the prosecutor's evidence should be determined in camera by the court.' Which I've done. It is exculpatory in my opinion. I don't know how you can get around that.
". . . .
"The Court: But the term `B' and `Bouty Bouty' never came up in the first trial. I do recall that.
"Here's what I am going to do. I'm going to deny your motion for a mistrial. I'm going to allow you to cross-examine Detective Hardiman about these notes and what these witnesswho they identified. I still have the power to grant a new trial if there is a conviction this case. I will rule on that at the appropriate time.
". . . .
"Mr. Felton: That's not the summary I'm talking about. I'm talking about the summary he has on the very front. There's an investigative report that Detective Hardiman wrote down that I gave to Mr. Spencer. It's right here.

*1141 "The Court: I'm just looking at the summary of what the three witnesses said.
"Mr. Felton: This is what I have in my file and this is what I showed to Mr. Spencer.
"(Documents passed to the Court.)
"The Court: Well, you see, this says that three listed witnessesI assume that's the three people on the police reportwere in the residence at 6822 Kimberly Avenue at the time of the shooting. They stated that the two people that had left the apartment were B and Bouty Bouty.
"That's a far cry from what they say in there. They say B pulled the gun and shot the man. One of them says Bouty Bouty took the clothes and ran. That's a far cry from saying they came out of an apartment. That's a whole different ballgame.
"Here is what these witnesses say in Detective Hardiman's notes is that B and/or Bouty, are the ones, or the two people that shot the man.
"Mr. Felton: That's what I thought they said.
"The Court: That's not what is in the summary. If you want to look at it, you step right up here and look at it all you want, because it's not in there. There is a big difference.
"Mr. Penick: May I look at it, Judge?
"The Court: Yes. You may, I guess, since we are all looking at it. It's on the second page. I can take you to several cases including a capital murder case tried in this circuit where [a prosecutor] didn't disclose such information and the Supreme Court of this state reversed the case. Said it should have been given.
"Mr. Felton: That's what I thought that they said and that's why
"The Court: That's not what it says. I want you to look at it and you make your own determination. From what I read, it just says they came out of the apartment. It doesn't say anything about them doing the shooting.
". . . .
"The Court: All right. We are going to do what I said we were going to do to begin with. I'm going to allow you to cross-examine Detective Hardiman about it. I'm going to overrule your request for a mistrial."
(R. 325-36.) The jury was brought back in, and Wilson continued to cross-examine Detective Hardiman.
It is undisputed that the prosecutor did not disclose Detective Hardiman's notes to Wilson until after the second trial had begun. There is no question, as the trial judge recognized, that testimony from three eyewitnesses, indicating that someone other than Wilson had committed the crimes, would have been favorable to Wilson and material to the defense. The trial judge determined that the State should have produced Detective Hardiman's notes, and ordered that a copy be furnished to Wilson.
In denying Wilson's motion for a mistrial, the trial judge stated that it was apparent that Wilson made the discovery request and that the evidence was "obviously exculpatory." (R. 325.) The trial judge correctly noted that exculpatory evidence was not provided to Wilson and that, if he had not allowed Wilson to elicit testimony from Detective Hardiman that would have otherwise been inadmissible hearsay, a mistrial would have been the appropriate remedy. In allowing Wilson to question Detective Hardiman about the three witnesses' identifications of "B" and "Bouty Bouty" as the perpetrators, the trial judge fashioned the remedy he felt best cured the prosecution's failure to timely produce *1142 the evidence. Rule 16.2, Ala. R.Crim. P., provides the trial court the discretion to fashion a remedy he feels best suited to cure the failure to produce.
The corrective action taken by the trial court was to allow Wilson to elicit otherwise inadmissible hearsay testimony that the three witnesses had implicated "B" and "Bouty Bouty" as being involved in the robbery and shooting, and not Wilson or Arrington.
However, the prosecutor then was allowed, on redirect examination, to question Detective Hardiman about the fact that one of the witnesses had recanted her statement.
"[Mr. Felton]: Well, did they change their stories?
"[Detective Hardiman]: One of them did, yes, sir.
"[Mr. Felton]: And the other two said they didn't see the shooting?
"[Detective Hardiman]: No, sir. They said they did not see the shooting.
"Mr. Penick: Objection to the hearsay part.
"The Court: Overruled. If we're going to let it in, we're going to let it all in.
"[Mr. Felton]: So one person first said they saw the shooting and then recanted that statement to you and said they didn't see the shooting, right?
"[Detective Hardiman]: Yes, sir.
"[Mr. Felton]: And the other two said they didn't see it at all?
"[Detective Hardiman]: Yes, sir."
(R. 339.)
Thus, the trial court's corrective action, though well-intentioned, was inadequate in that it did not have the effect of correcting the prosecutor's failure to produce the exculpatory evidence.
This Court, in Jefferson v. State, 645 So.2d 313 (Ala.Crim.App.1994), stated that "`the existence of any small piece of evidence favorable to the defense may, in a particular case, create just the doubt that prevents the jury from returning a verdict of guilty.'" Jefferson v. State, 645 So.2d at 316-17(quoting United States v. Bagley, 473 U.S. 667, 692-93, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)(Marshall, J., dissenting)). Had Wilson known of the content of Detective Hardiman's notes, he would certainly have made a greater attempt to locate the three witnesses and secure their testimony for trial.
Wilson was able to locate one of the witnesses, Dalanda Smith, who testified at the second trial that, on the night of the shooting, "B" and "Bouty Bouty" had been at her house. She testified that after "B" and "Bouty Bouty" left, she looked out the window and saw them arguing with Hamilton, and then she looked away. When she heard the gunshots, she looked out the door and saw "B" and "Bouty Bouty" driving away in a burgundy Grand Prix automobile.[7] She saw Hamilton lying on the ground. She testified that she went by the name Dalanda Byrum at the time of the incident.
We find it important to note that although Wilson was able to get Dalanda Smith to testify, she did not actually see the shooting. Hickman, the only witness who saw the shooting, apparently later recanted her statement. The State was allowed to present that fact over Wilson's objection. Thus, the evidence before the jury was that Hamilton had identified Wilson and Arrington from photographic lineups. Shields identified Arrington, but testified that he picked him only because he was asked if he "recognized" anyone in the *1143 lineup, not if he saw anyone in the lineup who was involved in the offense. Hickman gave a statement to the police that "B" shot Hamilton, that "Bouty Bouty" took the clothes, and "B" and "Bouty Bouty" then left in a burgundy Grand Prix. Julius gave a statement to the police that "B" and "Bouty Bouty" from Bessemer left the apartment and were talking to Hamilton immediately before the shooting. As she walked downstairs, she heard the gunshots, looked out the window, and saw "B" and "Bouty Bouty" driving away. Smith's statement to the police and her testimony was that "B" and "Bouty Bouty" left the apartment immediately before the shooting and that they fled in a burgundy Grand Prix. Wilson and Arrington denied any involvement.
We note that, based on their statements, the testimony of these three witnesses would not have been cumulative, as each of them observed different details about the confrontation and alleged getaway car.
While we cannot state with certainty that Wilson would have been acquitted if the other two witnesses had testified and been subjected to cross-examination, that is not for this Court to decide. "`The credibility of witnesses and the weight or probative force of testimony is for the jury to judge and determine.'" Daniels v. State, 762 So.2d 864, 866 (Ala.Crim.App.1999) (quoting Zumbado v. State, 615 So.2d 1223, 1241 (Ala.Crim.App.1993)). The fact remains that, because the prosecution failed to produce Detective Hardiman's notes before trial, Wilson was not afforded the opportunity to present a full and complete defense.
The State, in its brief, points out that the three witnesses were listed on the police report, and that Wilson had had ample time to locate them if he planned to present their testimony at trial. Based on our review of the record, we cannot say that Wilson did, in fact, even know the correct names of two of the three witnesses, since the police report apparently lists incorrect names for two of the witnesses.[8] These are two of the three witnesses who identified "B" and "Bouty Bouty" as being involved, and not Wilson or Arrington, including the one eyewitness other than the victim who said she saw the actual shooting. Additionally, because Wilson did not know the substance of their testimony, he had no reason to expend the time or resources to locate them.
Any benefit Wilson received from his cross-examination of Detective Hardiman was negated by the prosecutor's redirect examination where he elicited testimony that Hickman had recanted her statement. Because of the prosecutor's failure to produce the statements in a timely fashion, Wilson was deprived of the opportunity to locate Hickman, and question her about what she observed, her statements to the police, and her reasons, if any, for the conflicting statements. This Court cannot even ascertain whether her name is Hickman, as the police incident report lists, or Hinkley, as the prosecutor referenced while he was questioning Dalanda Smith.
For better or for worse, Wilson was denied the opportunity to properly locate, prepare, and present three witnesses who told police, the night of the shooting, that they saw "B" and "Bouty Bouty" confronting Hamilton. Wilson was denied the opportunity to pursue those witnesses who would best suit his version of the facts, and *1144 the jury was deprived of the opportunity to render its verdict based upon the complete evidence. In light of the fact that the first trial ended in a hung jury, there is a reasonable probability that the additional witnesses would have swayed the jury so that it might have acquitted him. Because of the facts and circumstances presented in the record and because the prosecutor failed to produce the notes, we cannot say that Wilson received a fair trial. Therefore, we hold that the trial judge's corrective action, though well-intentioned, was not sufficient to cure the error caused by the prosecutor's failure to provide material exculpatory evidence, i.e., Detective Hardiman's notes, to the defendant. Therefore, we have no alternative but to remand this cause for a new trial.
Because we are reversing Wilson's convictions, we need not address the remaining issues he raised on appeal.
For the above-stated reasons, Wilson's convictions for robbery and attempted murder are reversed and this cause is remanded with directions for the trial court to conduct a new trial.
REVERSED AND REMANDED.
McMILLAN, P.J., and SHAW, J., concur. BASCHAB and WISE, JJ., dissent, with opinions.
BASCHAB, Judge, dissenting.
Under the specific facts of this case, I believe that error, if any, in the State's nondisclosure was harmless. Therefore, I respectfully dissent.
WISE, Judge, dissenting.
I dissent from the majority opinion reversing Wilson's attempted-murder and robbery convictions on the ground that the State failed to produce Detective Hardiman's notes before trial. Although I do not condone the State's failure to comply with court-ordered discovery, not every discovery violation requires a new trial. "Rule 16.5 [Ala.R.Crim.P.] `gives a trial judge a number of options to consider in imposing sanctions on a party who has failed to comply with the court's discovery order.'" Pettway v. State, 607 So.2d 325, 330 (Ala.Crim.App.1992) (quoting Clifton v. State, 545 So.2d 173, 178 (Ala.Crim.App. 1988)). As this Court stated in McCrory v. State, 505 So.2d 1272, 1279 (Ala.Crim. App.1986):
"The imposition of sanctions upon noncompliance with a court's discovery order is within the sound discretion of the court. United States v. Koopmans, 757 F.2d 901, 906 (7th Cir.1985); United States v. Saitta, 443 F.2d 830, 831 (5th Cir.1971); Hansen v. United States, 393 F.2d 763, 770 (8th Cir.1968). Moreover, the trial court should not impose a sanction which is harsher than necessary to accomplish the goals of the discovery rules. United States v. Gee, 695 F.2d 1165, 1169 (9th Cir.1983)."
Accord Wilson v. State, 777 So.2d 856, 918 (Ala.Crim.App.1999), aff'd, 777 So.2d 935 (Ala.2000).
Based upon my review of the record, it appears that the nondisclosed evidence, i.e., the fact that three witnesses had identified two men other than Wilson and his cohort Arrington as the persons who shot Hamilton, had already been put before the jury, even before the contents of Detective Hardiman's notes were made known to the court. After the existence of the notes was disclosed, the court determined that by failing to disclose the notes, the State had, in fact, violated the court's discovery order. However, the court determined that an appropriate remedy would be to allow Wilson to introduce the substance of Hardiman's notes to the jury, despite the fact that the notes constituted uncorroborated, untested hearsay evidence that *1145 three unavailable witnesses had identified two other men as Hamilton's assailants. In my opinion, the circuit court did not abuse its discretion in fashioning what it determined was an appropriate remedy for the State's nondisclosure of exculpatory evidence.
Moreover, after reviewing the record, I believe that any error in the State's failure to disclose Detective Hardiman's notes constituted nothing more than harmless error. Rule 45, Ala.R.App.P., states in pertinent part:
"No judgment may be reversed or set aside, nor new trial granted in any ... criminal case on the ground of ... the improper admission or rejection of evidence... unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties."
I do not agree with the majority's conclusion that the State's failure to disclose these notes deprived Wilson of the opportunity to present a full and complete defense because it denied him the opportunity to present the testimony of the unavailable witnesses. At the time of Wilson's second trial, neither the State nor Wilson was able to locate more than one of the three witnesses interviewed by Hardiman. Thus, there is no guarantee that yet another trial would allow Wilson to locate these witnesses. Here, the jury had the opportunity to hear the testimony of Dalanda Smith, the only one of the three witnesses that either party was able to locate. Ms. Smith testified that on the night Hamilton was shot, she heard gunshots, looked outside her window, and saw "B" and "Bouty Bouty" driving away from where Hamilton lay on the ground. The jury also had the opportunity to hear Hamilton testify that Wilson had shot him. Additionally, other witnesses pointed out the automobile carrying Hamilton's assailants as it sped away from the scene. Police followed the car from the scene and, upon stopping it, discovered Wilson inside. I do not believe that Detective Hardiman's notes were material, nor do I believe that it is reasonably probable that the outcome of the trial would have been different had the evidence been disclosed to the defense. See Minnis v. State, 690 So.2d 521, 527 (Ala.Crim.App.1996) (citing Kinder v. State, 515 So.2d 55, 64 (Ala. Crim.App.1986)). Accordingly, I would affirm Wilson's conviction.
NOTES
[1] Wilson's codefendant, Trumaine Arrington, was also convicted of first-degree robbery and attempted murder. Arrington was sentenced to 30 years' imprisonment in each case, with the sentences to run concurrently.
[2] The night of the shooting, three witnesses gave statements to the police that individuals named "B" and "Bouty Bouty" from Bessemer had robbed and shot Hamilton. Wilson and Arrington do not go by the names "B" or "Bouty Bouty." This nickname was also spelled "Boudy-Boudy" and "Bowdy-Bowdy" in the police reports and the trial transcript. Because we are unsure which is the correct spelling of the nickname, this Court has adopted the trial court reporter's version "Bouty Bouty," except for those instances where we have quoted from a police report that spelled the name differently.
[3] This three-page Incident/Offense Report was provided to Arrington on March 25, 1999, but apparently was never provided to Wilson.
[4] Shields testified as a witness for the trial court. Shields testified that he did not identify Arrington as being involved in the incident. Rather, according to Shields, he knew Arrington from the community, and picked him because Detective Hardiman asked "do you know anybody in this lineup?" (R. 217.) Shields testified that he was never asked if he saw anyone in the lineup who was involved in the shooting.
[5] Hamilton testified that he knew Arrington as "Coon Dog." The record does not indicate who "Twan" is, but the implication is that "Twan" is Wilson's nickname or street name.
[6] In addition to this statement, Detective Hardiman's notes indicate that, on the following day, Hickman gave a second statement to the effect that she did not see the shooting, and did not know who shot Hamilton. In this second statement, Hickman said that she knew B and Bouty Bouty were in the group of boys outside when the shooting occurred.
[7] There was conflicting evidence presented at trial as to whether the automobile used in the robbery and shooting was a Grand Prix or a Ford Thunderbird.
[8] "Telisa" Hickman is listed on the police report, rather than Telisha Hinkley, as the prosecutor and Smith referred to her at trial. Also, Dalanda "Bryan" is listed on the report. Smith testified that she went by Dalanda Byrum at the time of the shooting. Smith is also referred to in the record as Dalanda "Bryant."