874 So.2d 1145 (2003)
Ex parte State of Alabama.
(In re Antywan Develle WILSON v. STATE of Alabama).
1020014.
Supreme Court of Alabama.
June 13, 2003.
*1146 William H. Pryor, Jr., atty. gen., and Michael B. Billingsley, asst. atty. gen., for petitioner.
Henry L. Penick of Penick & Associates, P.C., Birmingham, for respondent.
MOORE, Chief Justice.
The State petitioned for a writ of certiorari to challenge the Court of Criminal Appeals' reversal of Antywan Develle Wilson's convictions for first-degree robbery and attempted murder based on an alleged discovery violation by the State. Wilson v. State, 874 So.2d 1131 (Ala.Crim.App. 2002). We granted the petition to determine whether the State's failure to disclose potentially exculpatory evidence constitutes reversible error. We reverse and remand.

I. Facts
On January 20, 1998, between 9:00 p.m. and 11:00 p.m., Willie Hamilton was walking in the Gate City housing project where he lived. Hamilton was carrying a box of children's clothes he was trying to sell. Hamilton approached two men who had just emerged from the apartment building at 6822 Kimberly Avenue and asked if they were interested in purchasing the clothes. One of the men asked to see the clothes, took the box, and put it in the trunk of his car. Hamilton demanded that the men *1147 either pay for the clothes or give him back the box. The men told Hamilton to go away, and when he refused, the two men huddled together for a brief period. One of the men then pulled a gun and shot Hamilton five times. The two men jumped in a car and sped away.
Antywan Wilson and Trumane Arrington were picked up within an hour of the shooting approximately one block from the scene of the shooting, driving a car matching a description a witness had given of the suspects' car. In a pretrial photographic lineup, and again at trial, Hamilton identified Wilson as the shooter and Arrington as the man who was with Wilson on the day of the shooting. A grand jury indicted Wilson for robbery and attempted murder on August 7, 1998, and his case was consolidated with Arrington's case, who was charged with the same offenses against the same victim.
On November 11, 1998, Wilson served the Jefferson County district attorney with a motion to produce or disclose any information and documents exculpatory to his case. On March 4, 2000, the district attorney responded to Wilson's request with a number of documents, including a police report that contained the names of the three witnesses to the shooting. The prosecution provided Arrington's counsel with a copy of the incident report as well, but did not provide the report to Wilson. However, the district attorney's response did not include statements from the victim, defendants, or witnesses. Wilson's counsel wrote the prosecution requesting additional information; he received no new information in response to that inquiry.
The case went to trial on April 18, 2000; it ended in a mistrial when the jury was unable to reach a verdict. Wilson's second trial, also consolidated with Arrington's, began on November 6, 2000. Hamilton again identified Wilson as the man who had shot him, stating that he was "sure" it was Wilson because "I was looking dead at him when he shot me."
Wilson's counsel asked the investigating officer, Detective Corey Hardiman, if he had interviewed the three witnesses listed in the police report: Dalanda Smith,[1] Akia Julius, and Telisa Hickman.[2] The report listed Smith's address as the apartment at 6822 Kimberly Avenue in Birmingham, approximately the same location as the shooting. Det. Hardiman testified that he had interviewed the witnesses and that he had taken notes of the interviews. Wilson's attorney then moved to have those notes made available to the defense. Under further questioning from Wilson's counsel, Det. Hardiman testified that the three witnesses had identified two men named "B" and "Bouty Bouty" as the perpetrators of the shooting. Det. Hardiman testified that he attempted to track *1148 down those individuals but that he was unable to do so because the names given by the witnesses were nicknames.
After the examination of Det. Hardiman, Wilson's counsel argued that Det. Hardiman's notes of the interviews constituted exculpatory evidence and, therefore, that the notes should have been disclosed to the defense before trial. Subsequently, both Wilson and Arrington moved for a mistrial based on the prosecution's failure to timely disclose allegedly exculpatory evidence. The trial court denied the motion. The trial court ruled that the evidence was exculpatory, but in an effort to avoid a mistrial and to ensure that the failure to disclose the evidence would not affect the jury's judgment, he permitted the defendants to cross-examine Det. Hardiman about the contents of his notes. Following that examination, the defense also put one of the witnesses, Dalanda Smith, on the stand and questioned her about her recollection of the robbery/attempted murder.
At the conclusion of the trial, Wilson and Arrington made a motion for a new trial based upon the State's failure to disclose allegedly exculpatory evidence. The trial court ruled:
"I deny the motion for new trial and make the following finding of facts:
"First of all, the three witnesses who are at issue here, the names were provided to the defendant before the first trial.
"At the trial of this case the detective was allowed to testify about their failure to identify anybody from the lineups presented to them. I'm not sure that it's exculpatory information. Even if it islet's say that it is exculpatory information for purposes of this motion, the witnesses' names were provided to the defendants well before the trial of this case. In fact, they were provided before the first trial which ended in a mistrial or hung jury. So it's been available to the defendants for several years, apparently from the time the discovery was first provided. The information contained in the supplemental report that the defendants became aware of, quite frankly if that information attributed to those people had been provided to the defendants, I don't think the outcome of this trial would have been any different.
"Apparently the defendants could not locate the witnesses before the trial other than Ms. Smith whom they did locate and who did testify in front of the jury in this case. Apparently her testimony did not help the defendants in any significant way. So even though the defendants maintain it's exculpatory, even if it is, I don't think the outcome of this trial would have been one bit different than it was."
On appeal, the Court of Criminal Appeals, in a 3-2 decision, reversed Wilson's conviction, holding:
"Wilson was denied the opportunity to pursue those witnesses who would best suit his version of the facts, and the jury was deprived of the opportunity to render its verdict based upon the complete evidence.... [W]e cannot say that Wilson received a fair trial.... Therefore, we have no alternative but to remand this cause for a new trial."
Wilson v. State, 874 So.2d at 1143-44.

II. Analysis
In Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court ruled that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Evidence is material "if there is a reasonable *1149 probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Thus, "[t]here are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).
As mentioned above, the evidence in question involves the contents of notes taken by Det. Hardiman when he interviewed three witnesses concerning the crimes. Det. Hardiman testified that he interviewed the witnesses because they were listed on the incident report prepared by police officers Michael Johnson and Anthony Wallace, the officers first on the scene after the shooting. That report, which Wilson and Arrington had in their possession before trial, summarized the testimony of the three witnesses as follows:
"Witnesses stated that they were present inside the residence of 6822 Kimberly Ave. when two black males started knocking on the door of the residence. The two black males were demanding to use the phone inside of the residence. Witnesses told the two black males that they could not use the phone. The two black males left the residence and confronted the victim in the street."
Officers Johnson and Wallace testified that they returned to 6822 Kimberly Avenue approximately an hour after they apprehended Wilson and Arrington, in an effort to get the women to identify whether Wilson and Arrington had committed the shooting, but no one answered the door.
Det. Hardiman testified that he went to the residence and interviewed the three women approximately two days after the shooting. The Court of Criminal Appeals summarized Det. Hardiman's testimony as follows:
"According to [Det. Hardiman's] notes [of the interviews], on the night of the shooting, Dalanda Bryant made the following statement:
"`The two people at her house were "B" and "Bowdy-Bowdy"[[3]] from Bessemer. They were driving a burgundy Grand Prix [automobile]. As they were leaving her house the [victim] was walking up. They had been at the house twenty minutes.'
"(CR.104.) Telisha Hickman gave the following statement:
"`The guy who walked up [was] trying to sell something. That guy was shot. "B" shot him. Bowdy-Bowdy was just looking. Bowdy-Bowdy drove. They took clothes from the man as they left.'
"(CR.104.) Detective Hardiman's notes indicate that Akia Julius was upstairs looking out the window when the men left the apartment, and she gave the following statement:
"`"B" and "Bowdy-Bowdy" were at the house for about 20 minutes. The man approached them as they walked out the door. The man was acting smart with them. On the way downstairs she heard the gunshots. They drove away in a burgundy car.'
"(CR.104.)"
Wilson, 874 So.2d at 1136 (footnote omitted). Additionally, Det. Hardiman's notes *1150 of the interviews indicated that a day later, Det. Hardiman showed Smith, Hickman, and Julius photographic lineups containing pictures of Wilson and Arrington, and none of them picked Wilson or Arrington out of the lineups. Det. Hardiman also re-interviewed Hickman, and "she stated that there were 5 or more guys out back when the man got shot. She does not know who shot [Hamilton]. She knows `B' and `Bowdy-Bowdy' were among the group of boys out back."
In summary, Det. Hardiman's notes relate that the witnesses attributed the shooting to two individuals known as "B" and "Bouty Bouty," not Wilson and Arrington, information the police incident report did not provide concerning the witnesses' testimony. There is no dispute that Wilson and Arrington were not given Det. Hardiman's notes until midway through the second trial. Thus, as the trial court stated during the in camera discussion after the notes came to light, "obviously [the notes] are exculpatory because they say somebody else did the shooting, whoever B and Bouty Bouty happen to be, and they should have been disclosed to [Wilson]."
It is clear, then, that the failure by the State to disclose Det. Hardiman's notes meets the first two components of a Brady violation, because the evidence was potentially exculpatory and the prosecution suppressed the evidence, regardless of whether it did so intentionally or inadvertently. See Strickler, 527 U.S. at 281-82, 119 S.Ct. 1936. The only remaining question, and the point at which this Court departs from the conclusion of the Court of Criminal Appeals, is whether that error prejudiced Wilson, or more specifically, whether "there is a reasonable probability that his conviction ... would have been different had these materials been disclosed." 527 U.S. at 296, 119 S.Ct. 1936.
The testimony of Officers Johnson and Wallace, as well as the contents of the police report, made apparent to the jury before Det. Hardiman's notes came to lightthat, in their initial interviews, witnesses Smith, Hickman, and Julius did not name the persons they thought had committed the crimes. Yet, as the trial court noted in the in camera discussion when the notes were disclosed, "[t]he jury has already heard testimony that these two people [`B' and `Bouty Bouty'] were at least identified by three witnesses as the perpetrators. They've heard that evidence." This was because before counsel was shown the contents of Det. Hardiman's notes, Wilson's counsel asked Det. Hardiman whether in the course of his investigation he had been given "two leads," the names "B" and "Bouty Bouty," as possible suspects. Det. Hardiman answered that he had been given those names, but that he "could not find anybody other than the people that gave me those names originally that even said there were two people who existed named B and Bouty Bouty." He added that the names were nicknames and "[t]here was no way for me to follow up on a nickname if I don't have the real name."
During the in camera discussion, Wilson's counsel related to the trial court that he knew about "B" and "Bouty Bouty" because he had located Dalanda Smith and had talked to her on the telephone, discovering that she had told Det. Hardiman about the two alleged suspects. Thus, though it took more effort than it would have if the State had turned over to the defense Det. Hardiman's notes when it was supposed to, even without the notes, Wilson was aware of the potentially exculpatory evidence and, in fact, presented it to the jury. This reduced any likelihood that the jury's determination would have *1151 changed had the evidence been disclosed earlier.
Furthermore, the trial court's ruling, allowing Wilson to cross-examine Det. Hardiman about the contents of the notes, enabled Wilson to place the substance of the notes before the jury, despite the fact that Det. Hardiman's testimony as to what other people had told him constituted hearsay.[4] Thus, Wilson was able to present to the jury the information that three witnesses had named two other men as the perpetrators of the crime, and the witnesses who were not located were not subject to cross-examination by the State. The trial court's ruling helped eliminate any prejudice that could have resulted from the State's failure to disclose the evidence because the key substance of that evidencethe naming of "B" and "Bouty Bouty" as the parties responsible for the crimeswas presented for the jury's consideration.
The Court of Criminal Appeals found that "[a]ny benefit Wilson received from his cross-examination of Detective Hardiman [about his notes] was negated by the prosecutor's redirect examination where he elicited testimony that Hickman had recanted her statement." Wilson, 874 So.2d at 1143.
The remedy offered by redirect examination should not be dismissed so cavalierly for two reasons. First, as quoted above, the very notes used as a basis for Hickman's testimony state that Det. Hardiman interviewed Hickman a second time the day after his initial interview with her and that in the subsequent interview she denied that she saw who shot Hamilton. For the trial court not to have allowed the prosecution to bring out that fact would have meant misleading the jury regarding the contents of Det. Hardiman's notes.
Second, during Wilson's counsel's cross-examination of Det. Hardiman regarding the notes, Det. Hardiman had already stated that Hickman had recanted her testimony.
"Q. [Wilson's counsel]: And did these witnesses indicate they had seen the shooting?
"A. [Det. Hardiman]: Well, originally on speaking to the three women, one of them told me she had seen the shooting. In a subsequent conversation I had with her she changed her story and said that she had not seen the shooting.
". . . .
"Q. [Wilson's counsel]: Were you informed by one of the witnesses that B had shot Mr. Hamilton?
"A. [Det. Hardiman]: Yes, sir. That was the woman that indicated first she had seen the shooting, and later stated that she had not."
Thus, when the prosecution questioned Det. Hardiman on redirect about the notes and asked him whether Hickman had recanted her testimony, it did nothing more than reemphasize what Det. Hardiman had already related to the jury about Hickman's testimony. The prosecution's redirect could not have negated the trial court's cure because Wilson's counsel had already elicited from Det. Hardiman the information about Hickman's change in testimony.
Finally, because Wilson's counsel was able to locate Dalanda Smith, he was able to put her on the witness stand to present live testimony from one of the three witnesses *1152 naming "B" and "Bouty Bouty" as the perpetrators of the crime. Smith testified that "B" and "Bouty Bouty" asked to use the telephone in her apartment but that she did not know them; she testified that Hickman and Julius knew them. Smith stated that the two men stayed in the apartment for about 20 minutes. She testified that she saw the men engage Hamilton in conversation outside. She said that a few minutes later she heard gunshots and looked outside again, and that she saw "B" and "Bouty Bouty" jump into a car and drive away. Thus, Wilson was able to present live testimony from one of the three witnesses concerning the exculpatory evidence.
The Court of Criminal Appeals discounted the effect of this testimony in curing the prosecution's discovery error because, according to Det. Hardiman's notes, it was Hickman, not Smith, who actually observed who shot Hamilton. The Court of Criminal Appeals expressed the belief that it would have been better if Hickman could also have testified, as well as Julius, because each observed different details about the confrontation between the men and Hamilton. Wilson, 874 So.2d at 1143. The Court of Criminal Appeals stated that Wilson was not able to put Hickman and Julius on the stand "because the prosecution failed to produce Detective Hardiman's notes before trial[; therefore,] Wilson was not afforded the opportunity to present a full and complete defense." Wilson, 874 So.2d at 1143.
This statement ignores two key facts: First, as already discussed, Hickman later retracted her claim that she actually saw the shooting, so it is doubtful whether having an opportunity to put her on the stand would have benefited Wilson. Secondly, and most importantly, while it may have been ideal to have all of those witnesses available, the difficulty in locating them and getting them to testify was precisely the reason the trial court chose to fashion the remedy it did. The trial court stated repeatedly that the defense possessed the names of those witnesses even before Wilson's first trial, yet neither the defense nor the police were able to locate Hickman and Julius. The trial court justifiably believed that it was highly unlikely that those witnesses would have been located even if the prosecution had provided the defense with Det. Hardiman's notes before trial. Consequently, the trial court did what it viewed as the next best thing: it allowed the defense to question Det. Hardiman about what the witnesses had told him. This situation is precisely the reason a trial court is granted wide discretion to remedy discovery violations. See, e.g., Rule 16.5, Ala. R.Crim. P., and Morrison v. State, 601 So.2d 165, 173 (Ala.Crim. App.1992).
In concluding that Wilson "was not afforded the opportunity to present a full and complete defense," 874 So.2d at 1143, the Court of Criminal Appeals simply assumed that the defense would have been able to locate Hickman and Julius in time for trial had it been given Det. Hardiman's notes before trial. Indeed, the Court of Criminal Appeals goes so far as to claim that "[h]ad Wilson known of the content of Detective Hardiman's notes, he would certainly have made a greater attempt to locate the three witnesses and secure their testimony for trial." Wilson, 874 So.2d at 1142.
All of the evidence, however, is to the contrary. The defense had the police report, which contained the names of the witnesses, before trial,[5] and Arrington's *1153 counsel had a copy of the incident report, which listed the known addresses for each of the witnesses. Det. Hardiman used the police report to locate the witnesses, and his notes do not list any different contact information than does the incident report, so the notes would not have helped in that regard. In the abstract, it is at least questionable whether Wilson would have tried harder to locate those witnesses had he known that they named two other men as the perpetrators of the crimes. Smith, Hickman, and Julius were the only witnesses listed on the police report. The police officers first on the scene of the crime, Officers Johnson and Wallace, both testified that they talked to these women. Det. Hardiman testified at the first trial that he interviewed the three witnesses during his investigation.[6] The incident report relates that those witnesses stated that "two black" men tried to use the telephone in the residence they occupied and that these men "confronted the victim in the street." Given that Wilson's counsel knew all of this before trial, it stands to reason that even without Det. Hardiman's notes, he would have expended a great deal of effort to try and locate those witnesses to obtain the full content of their testimony.
But speculation in the abstract is not even necessary, because Wilson's counsel stated during the in camera discussion concerning Det. Hardiman's notes:
"We [Wilson's counsel and Arrington's counsel] kept searching for Delanda Bryant and through a lot of searching we found out that her name was Delanda Smith. We tracked her down ... [and] I've talked to her on the phone. I tried to get her to come up here. The address that I talked to her on the phone, I'm led to believe she doesn't live there and she won't tell me where she lives."
(Emphasis added.) Thus, without Det. Hardiman's notes and without the correct name, Wilson's counsel already had been searching "a lot" for Smith, and he eventually found her. Indeed, he was able to convince Smith to take the stand later in the trial. Wilson's counsel also made it clear to the trial court in that discussion that the defense had also been searching for the other two witnesses, but "we can't find any of the other witnesses." The actual efforts of the defense to locate these witnesses belies the assumption of the Court of Criminal Appeals that Wilson's counsel would have "made a greater attempt" to locate them had he possessed Det. Hardiman's notes before the trial.
In the end, the most important point is whether any effort, even with the notes, would have yielded those witnesses for trial. As has been shown, Det. Hardiman's notes did not substantively provide anything more than the incident report that would have helped the defense to locate the witnesses, beyond the supposed *1154 psychological motivation, assumed by the Court of Criminal Appeals, of learning that the witnesses had named two men other than Wilson and Arrington as the perpetrators. By the time of the second trial, neither the State nor Wilson's counsel was able to locate more than one of the three witnesses interviewed by Det. Hardiman. Wilson's counsel hired an investigator in February 2001 after the second trial to help locate those witnesses, and he was unable to locate any of them other than Smith, despite looking for at least two months. Thus, it is highly unlikely that these witnesses would have been located in time for trial had the State turned over Det. Hardiman's notes before trial.
Considering that the nondisclosed evidence was presented to the jury even before the contents of Det. Hardiman's notes were revealed to the defense; that the contents of the notes were presented to the jury in their entirety despite their hearsay nature; that live testimony of one of the three witnesses was also presented to the jury; that Wilson's counsel expended a great deal of effort to find those witnesses even without Det. Hardiman's notes; and that the defense was unable to locate those witnesses even after possessing the notes, this Court finds that there was not a "reasonable probability that, had [Det. Hardiman's notes] been disclosed to the defense [earlier], the result of the proceeding would have been different." Bagley, 473 U.S. at 682, 105 S.Ct. 3375. Consequently, there was no Brady violation, and Wilson's convictions should not have been overturned on this basis. The judgment of the Court of Criminal Appeals is reversed and the cause is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
HOUSTON, SEE, BROWN, HARWOOD, and STUART, JJ., concur.
LYONS, J., concurs in the judgment only and dissents from the directions on remand.
JOHNSTONE and WOODALL, JJ., dissent.
LYONS, Justice (concurring in the judgment only and dissenting from the directions on remand).
I would reverse the judgment of the Court of Criminal Appeals and direct that court to remand this case for further proceedings at which Wilson would be given an opportunity to demonstrate to the trial court that he has located the witnesses who were not disclosed to him in a timely fashion and that they indeed possess exculpatory evidence. If Wilson makes such a showing, then he should be entitled to a new trial with the benefit of the testimony of the heretofore missing witnesses. If he fails to make such a showing, the trial court should deny the motion for a new trial.
JOHNSTONE, Justice (dissenting).
I respectfully dissent. I agree with the opinion of the Court of Criminal Appeals, except that I agree with the remedy proposed by Justice Lyons in his special writing. The thorough statement of facts by the Court of Criminal Appeals supports its holdings.
Two particular mistakes in the main opinion invalidate its conclusions. First, the main opinion assumes as true the testimony by Detective Hardiman that the eyewitness residents of 6822 Kimberly Avenue had recanted their exculpatory statements. This testimony by Detective Hardiman was entirely self-serving. What better way could the State eliminate not only its Brady[7] problem but also any benefit Wilson *1155 had received from the trial judge's remedy of allowing Wilson to introduce the exculpatory statements themselves? After Detective Hardiman's testimony that the 6822 Kimberly residents had recanted, only their live appearance and testimony to the contrary would have cured the Brady violation by the State.
Second, the main opinion mistakenly argues that timely disclosure of the exculpatory statements would not have resulted in Wilson's finding the two missing 6822 Kimberly residents and presenting them as witnesses. Defense counsel, of practical and professional necessity, must decide what leads to pursue according to the apparent defensive value of the leads. The names available to Wilson on the police report, none accurate, did not provide the same incentive and therefore did not suggest the same priority as the exculpatory statements would have provided had they been timely disclosed as required by Brady.
NOTES
[1] This witness was listed in the police report as "Delanda Bryan." At trial, "Bryan" testified that she now goes by the name "Dalanda Smith," but that she went by the name "Bryan at the time of the shooting." Smith's name was further confused at trial because while at first Smith indicated that she previously used the name "Bryant," under cross-examination she stated that her name was "Byrum." For the sake of consistency, we refer to Ms. Bryan/Bryant/Byrum/Smith in this opinion as "Smith," because that is the name used in the Court of Criminal Appeals' opinion.
[2] At trial, Smith stated that this friend's name was "Telisha Hinkley," not "Telisa Hickman" as it is listed in the police report. But "Hickman" is the name listed in the police report, identified in Det. Hardiman's notes, used throughout the trial in the record, and referred to by the Court of Criminal Appeals. Moreover, later testimony by Smith seems to indicate that perhaps "Hickman" is the right last name. Consequently, "Hickman" is the name we use in this opinion.
[3] This name is spelled different ways by different sources. To be consistent, this opinion elects, as did the Court of Criminal Appeals, to use the trial court's spelling, "Bouty Bouty," except when we quote directly from the record.
[4] The trial court was perfectly within its authority to allow such evidence because "`the remedy for violations of discovery rules [rests] within the sound discretion of the trial court.' " Morrison v. State, 601 So.2d 165, 173 (Ala.Crim.App.1992)(quoting Buchannon v.State, 554 So.2d 477, 486 (Ala.Crim.App. 1989)).
[5] The Court of Criminal Appeals discounts the fact that the names of the witnesses were listed in the police report by observing that Dalanda Smith was listed as "Dalanda Bryan" in the police report and Telisha Hinkley was listed as "Telisa Hickman" in the police report, making any attempt to locate those witnesses using the report difficult. Wilson, 874 So.2d at 1143 n. 8. However, as was noted in notes 1 and 2 to this opinion, Det. Hardiman's notes also list Smith as "Dalanda Bryan" and Hickman as "Telisa Hickman," so his notes would not have made locating those witnesses any easier than the police report.
[6] Wilson contends that Det. Hardiman testified at the first trial that the witnesses did not identify anyone as the perpetrators of the crimes. The State contends, however, that Det. Hardiman had testified that the three witnesses did not identify anyone from the photographic lineup, a fact confirmed by his notes. We do not have a transcript of the first trial, so no conclusions should be drawn from this testimony other than the fact that Det. Hardiman stated that he interviewed the witnesses.
[7] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).