Terry J. HARRINGTON, Appellant,

v.

STATE of Iowa, Appellee.

No. 01–0653.

Supreme Court of Iowa.

Feb. 26, 2003.

Rehearing Denied April 18, 2003.

Thomas P. Frerichs of Frerichs Law Office, P.C., Waterloo, for appellant.

Thomas J. Miller, Attorney General, Bridget A. Chambers, Assistant Attorney General, and Richard Crowl, Pottawattamie County Attorney, for appellee.

Thomas H. Makeig of Thomas H. Makeig, P.C., Fairfield, for amicus curiae Dr. Lawrence A. Farwell.

TERNUS, Justice.

Terry Harrington appeals a district court decision denying his application for postconviction relief. He claims the court erred in holding his claims were time barred. *See* Iowa Code § 822.3 (1999) (im-posing a three-year statute of limitations on postconviction relief actions). In addition, he faults the district court for failing to vacate his first-degree murder conviction and order a new trial on the basis of newly discovered evidence consisting of a recantation by the State's primary witness, police investigative reports implicating another suspect in the crime, and "brain fingerprinting" test results. *See id.* § 822.2(4) (providing postconviction remedy where material facts were not presented at criminal trial). Harrington also rests error on the court's refusal to grant relief based on a due process violation resulting from the prosecution's failure to produce the police reports at the time of Harrington's criminal trial. *See id.* § 822.2(1) (providing postconviction remedy where conviction was in violation of United States Constitution). The State disputes Harrington's allegations of error and affirmatively asserts that Harrington's appeal is untimely.

After submission of the appeal, Harrington filed a conditional motion for limited remand. In the event this court believes that he is not entitled to a new trial on the basis of the present record, Harrington seeks to have the case remanded for the purpose of taking additional testimony in support of his application.

Upon our review of the record and the arguments of the parties, we conclude (1) Harrington's appeal is timely; (2) this action is not time barred; (3) Harrington is entitled to relief on the basis of a due process violation; and (4) Harrington's motion for conditional remand is moot. Accordingly, we reverse the district court judgment, and remand for entry of an order vacating Harrington's conviction and sentence, and granting him a new trial. We deny Harrington's motion for remand on the basis of mootness.

## I. *Timeliness of Appeal.*

Before we discuss the merits of Harrington's appeal, we address the State's contention that this court lacks jurisdiction because Harrington's notice of appeal was not filed before the applicable deadline. *See In re Marriage of Mantz,* 266 N.W.2d 758, 759 (Iowa 1978) (stating when an appellant files a late notice of appeal, the appellate courts are without jurisdiction to hear the appeal). The trial court entered its decision on March 5, 2001. The defendant then filed a motion under Iowa Rule of Civil Procedure 1.904(2) asking the court to expand its findings of fact and conclusions of law. The court denied the motion on March 28 and Harrington filed his notice of appeal on April 20. Thus, the notice of appeal was filed within thirty days of the court's ruling on the post trial motion, but more than thirty days from the court's initial decision.

■ Iowa Rule of Appellate Procedure 6.5(1) requires that a notice of appeal be filed within thirty days of the trial court's decision or within thirty days of the trial court's ruling on any rule 1.904(2) motion that is filed. If the rule 1.904(2) motion is not timely filed, however, it will not toll the thirty-day time period for filing a notice of appeal. *See State ex rel. Miller v. Santa Rosa Sales & Mktg., Inc.,* 475 N.W.2d 210, 213–14 (Iowa 1991). A rule 1.904(2) motion must be filed within the time allowed for filing a motion for new trial, which is ten days after the filing of the district court's decision. *See* Iowa Rs. Civ. P. 1.904(2), .1007.

■ In the present case, the rules of civil procedure required Harrington to file his post trial motion by Thursday, March 15. Harrington acknowledges that his motion was not date stamped by the clerk of court on or before March 15, but claims he faxed a copy to the clerk of court and the presiding judge on that date. He also served a copy of the motion on opposing counsel by mail on the same day.[1]

The trial court file contains two copies of Harrington's motion, one file stamped on Monday, March 19 and one filed stamped on Tuesday, March 20. In addition, when this issue was raised by the State on appeal, the district court, at Harrington's request, entered an order "to clarify or correct the record." In this order, the court made a factual finding that Harrington had faxed a motion under rule 1.904(2) to the clerk and to the court on March 15, and had mailed a copy to the clerk on the same day. The court also noted that it had made a finding in its ruling on the rule 1.904(2) motion that the "motion was timely filed."

Although our rules contemplate that pleadings will be filed with the clerk, rule 1.442(5) addresses the situation where a pleading is filed with a judge. That rule provides:

> *Filing with the clerk defined.* The filing of pleadings and other papers with the court as required by these rules shall be made by filing them with the clerk of the court, *except that a judge may permit them to be filed with the judge, who shall note thereon the filing date and forthwith transmit them to the office of the clerk.*

Iowa R. Civ. P. 1.442(5) (emphasis added). We think the exception to the rule applies here.

---

1. Harrington's motion did not contain a proof of service. *See* Iowa R. Civ. P. 1.442(7) (requiring certificate of service on all papers required or permitted to be served or filed). The State does not complain about the *sufficiency* of the defendant's rule 1.904(2) motion, however, so we do not consider the absence of a certificate of service in determining the timeliness of this appeal.

The trial judge apparently accepted the defendant's motion for filing when the judge received a copy on March 15. Although the judge did not note the filing date on his copy as required by rule 1 .442(5), it appears the judge did transmit the motion to the clerk, as there are two copies in the clerk's file, each with a different date stamp. We think the judge's later ruling confirming his receipt and acceptance of the motion on March 15 substantially complies with the rule's requirement that the filing date be noted on the motion. Therefore, Harrington's rule 1.904(2) motion was timely filed and, consequently, his notice of appeal filed within thirty days of the court's ruling on his motion was likewise timely filed.

We turn now to the substantive issues raised in this appeal. Our discussion begins with the factual background and procedural history of this case.

## II. Background Facts and Proceedings.

A. *Original murder trial.* On August 4, 1978, Terry Harrington was convicted of first-degree murder in the shooting death of John Schweer. Because most of the relevant facts in this postconviction relief action relate to the underlying criminal proceeding in which Harrington was the defendant, we will refer to Harrington as the defendant in the remainder of our opinion.

Sometime after midnight on July 22, 1977, security guard John Schweer was murdered at a car dealership in Council Bluffs, Iowa. At the time, Schweer, a retired police captain, was a night watchman for several car dealerships in the area. Schweer had been shot, and a 12 gauge shotgun shell was found in the vicinity of the crime.[2] Footprints and dog prints were also discovered near Schweer's body.

Harrington, who was seventeen at the time, was charged with Schweer's murder and was ultimately convicted, primarily on the testimony of a juvenile accomplice, Kevin Hughes.[3] Hughes gave the following account of July 22, 1977. Shortly after midnight, Hughes, Harrington, and another juvenile, Curtis McGhee, went to the dealership with the intent to steal a beige Toronado. Hughes waited in Harrington's car while Harrington and McGhee walked around a building to find the desired automobile. Harrington had a shotgun. Shortly after Harrington and McGhee left, Hughes heard a gun shot. Then Harrington and McGhee came running back. Harrington said he had just shot a cop.

Hughes was impeached by the defense with prior statements he had made implicating other persons in the crime. Hughes had separately named three other men as the killer. Each man was ultimately discovered to have an alibi before Hughes finally fingered Harrington. Hughes admitted that he had also changed his testimony about the type of gun used, first stating that Harrington had a pistol, then a 20–gauge shotgun, and finally a 12–gauge shotgun. He conceded he was "a confessed liar," having lied "[a]bout five or six times talking about this case." Hughes

---

**2.** The police determined the shell was manufactured prior to 1966, some twelve years before the crime.

**3.** Hughes' status as an accomplice was disputed at the time of Harrington's murder trial. *See State v. Harrington,* 284 N.W.2d 244, 248 (Iowa 1979) (stating court had "serious doubts whether Hughes was an accom-plice"). Years later, however, when Harrington's claim for habeas corpus relief was heard in federal court, evidence had come to light that Hughes had been charged with a crime—conspiracy to steal an automobile—stemming from the events on the night of the murder. *Harrington v. Nix,* 983 F.2d 872, 875 (8th Cir.1993).

acknowledged that he visited the murder scene with the police and prosecutor and told them what he thought they wanted to hear. At the time, Hughes was being held on various theft and burglary charges and "he was tired of [being in jail]." He admitted that these charges were dropped after he agreed to testify against Harrington and McGhee.

The physical evidence linking Harrington to the crime was minimal. Hughes claimed Harrington wrapped the shotgun in his—Harrington's—jacket after the shooting. Chemical examination of the jacket by the police several weeks after the murder revealed two flakes of smokeless gunpowder consistent with the type used in shotgun shells. In addition, one of McGhee's friends testified that he saw part of a shotgun in the trunk of Harrington's car a few days before the murder.[4]

Harrington presented an alibi defense, but this defense was rebutted by the prosecution's witnesses who testified they saw Harrington with Hughes and McGhee late in the evening of July 21. These witnesses included Hughes' girlfriend, Candice Pride, and two other juvenile friends of Hughes, Roderick Jones and Clyde Jacobs. They testified they saw Hughes get into Harrington's car around eleven o'clock on the evening of July 21 and drive off with Harrington and McGhee. Another girlfriend of Hughes, Linda Lee, testified that Hughes came to her home in the early morning hours one night in July 1977. When she walked Hughes to the door as he was leaving, she saw Harrington's car. Lee stated she could not tell if Harrington

was in the vehicle, only that there were two other people in the car.[5] She could not recall which night in July this occurred.

Harrington and McGhee were both convicted of first-degree murder in separate trials. Harrington's appeal failed, *see State v. Harrington,* 284 N.W.2d 244 (Iowa 1979), as did a subsequent postconviction relief action in which he claimed that Hughes' testimony was perjured, *Harrington v. State,* 458 N.W.2d 874 (Iowa Ct.App. 1990). Harrington also unsuccessfully sought habeas corpus relief in federal court. *See Harrington v. Nix,* 983 F.2d 872 (8th Cir.1993). He is currently serving a life sentence without the possibility of parole.

B. *Second postconviction relief (PCR) action.* The present PCR action was filed in 2000, more than twenty years after Harrington's conviction. Based on this timing, the State asserted the statute of limitations as an affirmative defense. Harrington relied on an exception to the statutory limitations period for "a ground of fact or law that could not have been raised within the applicable time period." Iowa Code § 822.3. Although the trial court concluded the evidence upon which Harrington relied was newly discovered and could not have been discovered earlier in the exercise of due diligence, the court inexplicably concluded Harrington's petition for postconviction relief was time barred.

Notwithstanding this determination, the court also addressed the merits of the

---

4. The murder weapon itself was never found. Additionally, even though plaster casts were made of footprints found at the murder scene, the police did not compare these casts to Harrington's feet.

5. In our decision on Harrington's direct appeal, we stated that Lee "saw the defendant in his car with another person, waiting for

Hughes" when she walked Hughes to the door sometime "after midnight in July of 1977." *Harrington,* 284 N.W.2d at 249. A review of the trial transcript reveals, however, that Lee testified there were two persons waiting in the car for Hughes, but she could not see who these individuals were.

defendant's claim for relief. Harrington requested vacation of his conviction under Iowa Code section 822.2, which provides in pertinent part:

> Any person who has been convicted of, or sentenced for, a public offense and who claims that:
>
> 1. The conviction or sentence was in violation of the Constitution of the United States or the Constitution or laws of this state; [or]
>
> . . . .
>
> 4. There exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice;
>
> . . . .
>
> may institute, without paying a filing fee, a proceeding under this chapter to secure relief.

*Id.* § 822.2(1), (4). Harrington's claim under section 822.2(1) was based on an alleged due process violation arising from the prosecution's failure to turn over eight police reports to the defense during the criminal trial. *See Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215, 218 (1963) (holding failure of prosecution to disclose evidence that may be favorable to the accused is a violation of the Due Process Clause of the Fourteenth Amendment). The same police reports, in addition to recantation testimony and novel computer-based brain testing,[6] also served as a basis for Harrington's claim of newly discovered evidence under section 822.2(4).

In order to establish a *Brady* violation, the defendant had to prove "(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the issue of guilt." *State v. Veal,* 564 N.W.2d 797, 810 (Iowa 1997), *overruled in part on other grounds by State v. Hallum,* 585 N.W.2d 249, 253 (Iowa 1998). To prevail on his newly discovered evidence claim, Harrington was required to show:

> (1) that the evidence was discovered after the verdict; (2) that it could not have been discovered earlier in the exercise of due diligence; (3) that the evidence is material to the issues in the case and not merely cumulative or impeaching; and (4) that the evidence probably would have changed the result of the trial.

*Jones v. State,* 479 N.W.2d 265, 274 (Iowa 1991).

Because we conclude the due process claim is dispositive of the present appeal, we do not reach the question of whether the trial court erred in rejecting Harrington's request for a new trial on the basis of newly discovered evidence. Nonetheless, we briefly review the evidence introduced by the defendant at the PCR hearing with respect to various witnesses' recantation of their incriminating trial testimony, as it gives context to our later discussion of the materiality of the police reports. Because the scientific testing evidence is not necessary to a resolution of this appeal, we give it no further consideration.

1. *Witness recantation.* Harrington introduced testimony from three witnesses

---

**6.** This testing evidence was introduced through the testimony of Dr. Lawrence Farwell, who specializes in cognitive psychophysiology. Dr. Farwell measures certain patterns of brain activity (the P300 wave) to determine whether the person being tested recognizes or does not recognize offered information. This analysis basically "provide[s] information about what the person has stored in his brain." According to Dr. Farwell, his testing of Harrington established that Harrington's brain did not contain information about Schweer's murder. On the other hand, Dr. Farwell testified, testing did confirm that Harrington's brain contained information consistent with his alibi.

who had testified for the prosecution at the criminal trial: accomplice Kevin Hughes, and two individuals who rebutted Harrington's alibi, Candice Pride and Clyde Jacobs. All three recanted their trial testimony.[7]

Hughes testified that he made up the story about he, Harrington and McGhee going to the dealership to steal a car. He said he lied to obtain a $5000 reward being offered for information about the murder and to avoid being charged with the crime. (It appears Hughes was being held in Omaha on car theft charges at the time he came to the attention of the Council Bluffs police. Omaha authorities suspected that Hughes or others involved in a car theft ring might have been involved in or might know something about the Schweer homicide, and so contacted the Council Bluffs investigators.)

Pride testified that she knew nothing about Harrington's involvement in the murder and had no idea if her testimony at his criminal trial was true. She said she had simply testified to what Hughes told her to say because she was dating Hughes at the time.

Finally, Jacobs testified he lied when he said at the criminal trial that he saw Harrington with Hughes the night of the murder. Jacobs said he never saw Harrington that night. He claims he gave a contrary story at trial because he was pressured by the prosecutors and police. Jacobs stated he, Hughes, and others were stealing cars back then, and he implicated Harrington to avoid being prosecuted for those offenses. He asserted Harrington was never part of the car theft ring.

Joseph Hrvol, the then assistant county attorney who prosecuted the case against Harrington, testified for the State at the second PCR hearing. Hrvol emphatically denied that any "buy" money was offered to Hughes or that Jacobs' testimony was coerced. While there was no documentation in police records that Hughes had been offered a reward, one of the previously undisclosed police reports indicated that the police had "put the word out what we had to offer and what we wanted in return." This same report, dated July 27, 1977, stated that "officers made several other contacts this evening [July 25, 1977] putting out information money," and that the next day, "[s]ome of the contacts started to make contact back to [the police]." This report identified one individual by name who "was offered money if he could come up with something," and another potential witness "who was also offered information money."

The PCR court determined the recantation evidence could not have been discovered earlier in the exercise of due diligence. The court also concluded, however, that the recantations were not credible. The court considered the new testimony cumulative and merely impeaching, and thought it would not affect the outcome of the case in a new trial.

2. *Police investigative reports.* As indicated earlier, Harrington claims in the present action that eight police reports were not made available to him during his criminal trial in 1978. Harrington's original defense attorney, Paul Watts, died after the appeal of the criminal case and therefore his file was not available for review. Nonetheless, James Cleary, who represented Harrington on his first PCR claim, testified at the second PCR trial

---

7. Harrington asserts in his motion for limited remand that if this matter were remanded, he would present the testimony of the remaining two prosecution witnesses who had rebutted his alibi, Linda Lee and Roderick Jones. He claims these witnesses will also recant their trial testimony placing Harrington with Hughes on the night of the murder.

that he told the county attorney's office in 1987 "that [he] wanted to see everything," "the DCI files, . . . the police department files from Council Bluffs, and any and all related documents relative to their investigation." The materials disclosed to him at that time did not contain the eight police reports. The evidence showed these reports were not known to Harrington or his PCR attorneys until 1999 when a person who had become interested in Harrington's case asked the Council Bluffs police department for a copy of the complete file pertaining to Schweer's murder.[8] The police reports were produced at that time and eventually given to Harrington's present counsel.

Harrington argued this newly discovered evidence warranted vacation of his conviction. He also asserted a *Brady* violation occurred in 1978 because these reports contained potentially exculpatory evidence of an alternative suspect and they had been withheld by the prosecution. All but one of the eight reports documented the police department's investigation of another suspect in the Schweer homicide, forty-eight year old Charles Gates.

Of particular relevance here, these documents showed that Schweer had made a written request for additional lighting in the car lot just days before his murder. In a note dated 12:30 a.m. July 20, 1977, Schweer stated he had observed a man trying to get into one of the trucks "last night" and had chased him out of the parking lot. Schweer wanted the dealership to install floodlights in the car lot. Police confirmed this incident through John Burke, a Northwestern Bell employee who worked in the area of the car dealership and approached police after the murder to provide the following information. Burke told police he saw a man running with a dog in that vicinity shortly before midnight on July 19, 1977. At first Burke thought the man was carrying a board, but then realized it was a shotgun. Burke said that not long after he saw this man, another man in a vehicle stopped to ask if Burke had seen the running man. Burke later identified the person in the vehicle as John Schweer.

Another incident the following night was also documented in the police reports. This report, prepared by a Council Bluffs police officer on the morning of July 23, 1977, revealed that the officer had talked with Schweer in the early morning hours of July 21 concerning Schweer's observation of a man in the area of the dealership. Schweer told the officer that he had observed a man carrying what Schweer thought was a rifle, although the item could have been a car jack. Schweer said he had lost sight of the man, but he believed the man was still in the area, hiding in some nearby weeds. The officer's report also documented there was a dog in the vicinity that Schweer thought belonged to the man with the rifle.

The investigative reports also revealed the police had talked to an individual who worked at a service station near the car dealerships. This witness told the police he had seen a man walking a dog in that area during the evening hours on various occasions. This witness was able to identify Charles Gates as that person from a photograph.

---

8. Ann Danaher, who worked as a barber at the Iowa State Penitentiary in 1994, became acquainted with Harrington's case after striking up a conversation with Harrington's family in the parking lot of the penitentiary. Ms. Danaher worked for five years gathering information and talking to persons connected with the Schweer murder investigation and Harrington's prosecution in an effort to assist Harrington's family in proving his innocence.

Although the undisclosed reports state the police subsequently located Gates and questioned him at the police station, no summary or recording of that interview has been discovered. One of the reports also references a polygraph test administered to Gates by Confidential Polygraph Service in Omaha. This test was interpreted to show Gates was "not truthful in his denial of owning a shotgun or having shot John Schweer." The actual polygraph results, which are stated in one of the newly discovered reports to be contained in an addendum to that report, have never been produced, even though, according to the police, polygraph reports are usually put in the case file. The reports that were found showed that Gates was a suspect in a fourteen-year-old unsolved murder in Omaha. Police also learned during interviews with Gates' former neighbors and a former landlord that Gates was "a 'spooky type individual,'" was a loner, had "very strange living habits," and had three dogs that appeared to be "extremely mean."

Several Council Bluffs police officers involved in the investigation of Schweer's murder were also called to testify at the second PCR hearing. They basically confirmed the substance of the written reports. These officers agreed that several witnesses had seen Charles Gates in the vicinity of the car lot in the days surrounding the murder. An individual, whom the police thought was Gates, had been observed walking a dog and carrying a gun in the area. One officer, Larry Williams, stated the police thought Gates was the person Schweer had chased off the car lot a few days before Schweer's death. This same officer, who oversaw the investigation in the Schweer murder case, believed the police eventually excluded Gates as a suspect, but no one could now recall the reason for Gates' elimination. Although Officer Williams testified a report stating why Gates was no longer a suspect "should have been" in the file, such a report has not been discovered.

The district court found Harrington's trial counsel did not have the police reports in question and that the reports were material and not merely cumulative or impeaching. Nonetheless, the court concluded disclosure of the police reports probably would not have changed the outcome of the trial. The court noted that other information admittedly provided to Harrington's original attorney revealed "[m]ore than a dozen potential suspects, including Gates." The court noted one report known to defense counsel stated a person living in the vicinity saw an individual matching Gates' description walking dogs in the area. Moreover, defense counsel knew the police had taken casts of dog paw prints from the murder scene. Concluding the evidence would probably not have changed the outcome of the criminal trial, the district court denied postconviction relief on the basis of the *Brady* violation and under the theory of newly discovered evidence.

### III. *Scope of Review.*

 "Postconviction proceedings are law actions ordinarily reviewed for errors of law." *Bugley v. State,* 596 N.W.2d 893, 895 (Iowa 1999). But when the basis for relief is a constitutional violation, our review is de novo. *Id.* Because the basis for relief here is a due process violation, we employ a de novo review of the court's ruling on the asserted *Brady* violation. *See State v. Romeo,* 542 N.W.2d 543, 551 (Iowa 1996) (conducting a de novo review of due process claim based on a *Brady* violation).

 Our review of the court's ruling on the State's statute-of-limitations defense is for correction of errors of law. *See Dible*

*v. State,* 557 N.W.2d 881, 883 (Iowa 1996) (reviewing trial court's dismissal of PCR action as time barred "to correct errors of law"). Thus, we will affirm if the trial court's findings of fact are supported by substantial evidence and the law was correctly applied. *Benton v. State,* 199 N.W.2d 56, 57 (Iowa 1972). We start with that issue.

### IV. *Statute of Limitations.*

■ Iowa Code section 822.3 contains a statute of limitations for postconviction relief actions. At the time Harrington filed the present action, this provision required that PCR applications "be filed within three years from the date the conviction or decision is final or, in the event of an appeal, from the date the writ of procedendo is issued." Iowa Code § 822.3. This statute was enacted in 1984, several years after Harrington's conviction and appeal became final. *See* 1984 Iowa Acts ch. 1193, § 1 (codified at Iowa Code section 663A.3 (1985)). In *Brewer v. Iowa District Court,* 395 N.W.2d 841 (Iowa 1986), we held "that all potential postconviction applicants whose convictions became final prior to July 1, 1984, must file their applications for postconviction relief on or before June 30, 1987, or be barred from relief." 395 N.W.2d at 844 (holding Harrington's first PCR application was timely filed). Thus, Harrington's present action is time barred unless an exception applies.

To avoid this problem, Harrington relies on that part of Iowa Code section 822.3 providing that the three-year statute of limitations "does not apply to a ground of fact or law that could not have been raised within the applicable time period." The district court apparently concluded this exception did not apply because it ruled that Harrington's PCR action was "time barred by section 822.3."

■ In addition to the obvious requirement that an applicant relying on section 822.3 must show the alleged ground of fact could not have been raised earlier, the applicant must also show a nexus between the asserted ground of fact and the challenged conviction. *See Dible,* 557 N.W.2d at 884; *Hogan v. State,* 454 N.W.2d 360, 361 (Iowa 1990). This additional requirement is based on the common sense conclusion that it would be absurd to toll the statute of limitations pending the discovery of a trivial fact that could not possibly affect the challenged conviction. *See generally State v. Anderson,* 636 N.W.2d 26, 35 (Iowa 2001) (stating court interprets statutes to avoid an absurd result). Accordingly, we have held that an "exonerating ground of fact must ... be 'relevant and ... likely [to] change the result of the case.'" *Hogan,* 454 N.W.2d at 361; *accord Dible,* 557 N.W.2d at 884 ("a satisfactory nexus exists when the exonerating ground would likely have changed the result of the original criminal case").

■ The State contends and the trial court apparently believed that the nexus test mirrors the requirements for a substantive claim for postconviction relief based on newly discovered evidence. *See* Iowa Code § 822.2(4). To succeed on such a claim an applicant must establish, among other things, that the newly discovered evidence is material, not merely cumulative or impeaching, and would probably have changed the outcome of the trial. *See Jones v. State,* 479 N.W.2d 265, 274 (Iowa 1991). Although our prior cases have never equated the requirements for the ground-of-fact exception with a newly-discovered-evidence claim for relief, the language used in our cases dealing with both concepts is similar. *Compare Dible,* 557 N.W.2d at 884 (holding section 822.3 requires *likelihood* that result would be different), *with Jones,* 479 N.W.2d at 274

(holding section 663A.2(4) (now found at section 822.2(4)) requires *probability* of different result). Since this similarity has generated confusion in the present case, it is appropriate at this time to clarify the differences between these two concepts.

 Initially, we confirm our statement in *Hogan* that a postconviction-relief applicant relying on the ground-of-fact exception must show the ground of fact is relevant to the challenged conviction. 454 N.W.2d at 361. By "relevant" we mean the ground of fact must be of the type that has the potential to qualify as material evidence for purposes of a substantive claim under section 822.2. We specifically reject any requirement that an applicant must show the ground of fact would likely or probably have changed the outcome of the underlying criminal case in order to avoid a limitations defense. A determination of that issue must await an adjudication, whether in a summary proceeding or after trial, on the applicant's substantive claim for relief. We disavow our prior cases to the extent they are inconsistent with the standard we set forth today.

Turning to the case at hand, we note the trial court did not discuss whether the ground-of-fact exception asserted by Harrington applied. Notwithstanding the lack of express findings on this matter, we can safely assume the court's rejection of this exception was not based on Harrington's failure to show that he could not have raised the asserted matters earlier. With respect to both the undisclosed police reports and the recantation evidence, the court held, in ruling on Harrington's substantive claims, that he had proved they were discovered after the verdict in his criminal trial and that they could not have been discovered earlier than they were discovered in the exercise of due diligence. These findings are clearly supported by substantial evidence, which we have reviewed above, and so are binding under the standard of review applicable to the statute-of-limitations issue.

The court's rejection of the ground-of-fact exception was apparently based on its erroneous belief that Harrington had to prove the exonerating ground met the requirements for a claim of newly discovered evidence, a claim expressly rejected by the trial court. This error is significant because application of the correct principles of law requires a conclusion contrary to that reached by the trial court.

Having determined Harrington could not have raised these matters earlier, the only remaining task for the trial court was to decide whether there is a nexus between the undisclosed police reports and the recantation evidence on one hand and the defendant's conviction on the other. Clearly there is. Both classes of evidence are the type of facts having the *potential* to qualify as material evidence that probably would have changed the outcome of Harrington's trial. They are, therefore, relevant and, as such, meet the nexus requirement.

Because Harrington asserted a relevant ground of fact or law "that could not have been raised within the applicable time period," this action is not time barred. The district court erred in making a contrary ruling. That brings us to the merits of Harrington's application for postconviction relief.

## V. Due Process Claim.

We briefly restate two earlier observations to set the stage for our analysis. First, our review is de novo. *See Romeo,* 542 N.W.2d at 551. Second, to show a due process violation, Harrington must prove "(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material

to the issue of guilt." *Veal,* 564 N.W.2d at 810 (stating requirements for a *Brady* violation). We address each element separately.

A. *Suppression of the evidence.* Evidence is suppressed "when information is discovered after trial 'which had been known to the prosecution but unknown to the defense.'" *Cornell v. State,* 430 N.W.2d 384, 385 (Iowa 1988). This test does not mean, however, that evidence unknown to the individual prosecutor is not considered suppressed. *See Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490, 508 (1995). The prosecutor "has a duty to learn of any favorable evidence known to . . . others acting on the government's behalf in the case, including the police." *Id.* Regardless of whether the prosecutor actually learns of the favorable evidence, the prosecution bears the responsibility for its disclosure. *Id.* at 438, 115 S.Ct. at 1567–68, 131 L.Ed.2d at 508. Thus, it is the fact of nondisclosure that is important; "[t]he good faith or bad faith of the prosecution in failing to produce the evidence" is not. *Romeo,* 542 N.W.2d at 551; *accord Kyles,* 514 U.S. at 437–38, 115 S.Ct. at 1567–68, 131 L.Ed.2d at 508.

It is also now well established that the prosecution's duty to disclose "is applicable even if there has been no request by the accused" for the information. *Strickler v. Greene,* 527 U.S. 263, 280, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286, 301 (1999). Nonetheless, "if the defendant either knew or should have known of the essential facts permitting him to take advantage of the evidence," the evidence is not considered "suppressed." *Cornell,* 430 N.W.2d at 385.

The State does not dispute that the evidence in question was known to the prosecution—or at least the police—during trial. Nor does the State challenge the trial court's factual finding that the police reports were not known to the defense at trial. Upon our de novo review, we agree with the trial court and find that Harrington did not discover the reports until more than twenty years after his conviction when a person assisting Harrington's family obtained the complete file on Schweer's murder.

We also think the reports were "suppressed" within the meaning of the *Brady* rule. It is apparent from some of the questions asked by Harrington's defense counsel at trial that he had some information about a man seen walking a dog and carrying a shotgun near the railroad tracks by the car dealership. Gates is never mentioned by name, however, and Harrington's first postconviction relief counsel testified that there were no police reports referring to Gates in the materials provided to him by the prosecutor in 1987. In addition, one of the lead investigators testified without impeachment at Harrington's 1988 PCR hearing that the police had no immediate suspects in the Schweer homicide.[9] We think it probable that original trial counsel did not know that Gates was the suspicious person seen by witnesses in the area. Clearly, counsel did not know of Schweer's contact with a person fitting Gates' description in the nights preceding Schweer's murder, including the fact that Schweer caught this individual trying to break into a truck.

We conclude Harrington did not have the "essential facts" of the police reports so as to allow the defense to wholly take

9. The same officer admitted at Harrington's second PCR hearing in 2000 that Gates was a suspect within a couple of days of the murder.

advantage of this evidence. As the Nevada Supreme Court stated under similar circumstances, "[O]nly access to the documents themselves would have provided the range and detail of information necessary to fully understand the implications of the police investigation." *Mazzan v. Warden,* 116 Nev. 48, 993 P.2d 25, 37 (2000) (holding oral disclosure of identity of another suspect was not sufficient to avoid *Brady* violation for failing to produce police investigatory reports); *see also Wilson v. State,* —— So.2d ——, ——, 2002 WL 732110 (Ala.Crim.App.2002) (finding *Brady* violation despite defendant's knowledge of witnesses' identities, where withheld police report gave details of their testimony in the absence of which the defendant would have had "no reason to expend the time or resources to locate them"). Because Harrington did not have the essential details contained in the withheld police reports, we hold the evidence was suppressed.

▇▇▇ B. *Exculpatory nature of the evidence.* To prove a *Brady* violation, the defendant must show the undisclosed evidence was favorable to his defense. *See Romeo,* 542 N.W.2d at 551. Here, Harrington steadfastly claimed he did not commit the murder.[10] Obviously, evidence that someone else killed Schweer would be favorable to this defense. The police reports, documenting an individual with a shotgun and a dog caught trying to break into a truck late at night just days before the shooting, would provide abundant material for defense counsel to argue that Gates had the opportunity and motive to commit the crime, thereby creating reasonable doubt that Harrington was the perpetrator. Harrington has proved the second element of a *Brady* violation.

▇▇▇ C. *Materiality.* The suppression of favorable evidence is not a denial of due process unless the evidence is "material to the issue of guilt." *Id.* Evidence is material when " 'there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.' " *Cornell,* 430 N.W.2d at 386 (citing *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494 (1985)). This test does not require the defendant to prove disclosure of the evidence "would have resulted in his acquittal." *Romeo,* 542 N.W.2d at 551. As the United States Supreme Court has recently explained:

> [T]he materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. Rather, the question is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."

*Strickler,* 527 U.S. at 290, 119 S.Ct. at 1952, 144 L.Ed.2d at 307 (quoting *Kyles,* 514 U.S. at 435, 115 S.Ct. at 1566, 131 L.Ed.2d at 506); *accord State v. Tangie,* 616 N.W.2d 564, 572 (Iowa 2000). In deciding whether our confidence in the verdict is undermined, we consider "the totality of the circumstances, including the possible effects of nondisclosure on de-

---

**10.** At Harrington's sentencing he stated:

I just want you to know that no matter what happens, I know I'm innocent, and as long as, you know, I feel that inside, then I'm going to keep on fighting because I know I can't see myself locked up for the rest of my life for something I didn't do.

.... I feel like I was judged by the color of my skin and not the content of my character, and I'll always feel that way until I get, you know, the kind of verdict the testimony shows, and that's innocent or not guilty as they would say in the courtroom.

fense counsel's trial preparation." *Cornell*, 430 N.W.2d at 386.

Upon our de novo review of the record and consideration of the totality of the circumstances, our collective confidence in the soundness of the defendant's conviction is significantly weakened. Hughes, the primary witness against Harrington, was by all accounts a liar and a perjurer. With the police offering a $5000 reward for information, Hughes named three other individuals as the murderer before finally identifying Harrington as the perpetrator, and then only after the other three men produced alibis.

As questionable as Hughes' veracity is, it is not the character of the prosecution's principal witness that undermines our confidence in the defendant's trial; Hughes' ability and propensity to lie were well known in 1978. The unreliability of this witness is, however, important groundwork for our analysis because this circumstance makes it even more probable that the jury would have disregarded or at least doubted Hughes' account of the murder had there been a true alternative suspect. Gates was that alternative. *See Kyles*, 514 U.S. at 439, 115 S.Ct. at 1568, 131 L.Ed.2d at 509 ("[T]he character of a piece of evidence as favorable will often turn on the context of the existing or potential evidentiary record.").

At the original trial Gates was one of more than a dozen individuals who were considered by the police as the potential culprit. Certainly defense counsel would not have had the time and resources to track down and investigate each of these individuals. But if the defendant had known the additional information contained in the withheld investigatory reports, the defense would surely have focused its efforts on Gates, not only in preparing for trial, but at trial as well. Our conclusion is based on two important points revealed in these reports: (1) Gates' identification as the suspicious person seen in the area with a gun and a dog; and (2) Schweer's contact with Gates, which for the first time provided a concrete link between an alternative suspect and the victim.

The State is hard pressed to argue the defendant's trial preparation and trial strategy would not have been altered by this additional information. Officers testifying at the second PCR hearing admitted the police considered Gates to be "the prime suspect" based on their investigation, an investigation unknown to Harrington at the time of his criminal trial. It is fair to conclude that had Harrington's counsel been provided with this information, he would have zeroed in on Gates in his trial preparation and at trial, just as the police had zeroed in on Gates during their investigation. Harrington's attorney could have used Gates as the centerpiece of a consistent theme that the State was prosecuting the wrong person.

Independent witnesses placed Gates at the scene of the crime in the days before the murder. Independent witnesses saw him with a shotgun and a dog. The victim himself interrupted a person resembling Gates breaking into a truck only two nights before the victim was shot to death in the car lot. In contrast, Harrington was identified as the murderer by a confessed liar, whose testimony was corroborated only by two particles of gunpowder found on Harrington's coat several weeks after the murder and the now-recanted testimony of the witness's teenage cohorts. The murder weapon was never found and no one has ever connected Harrington with the dog prints found at the murder scene, even though the police from the beginning had focused their investigation on finding "a man with a dog."

Given this evidence, a jury might very well have a reasonable doubt that Harrington shot Schweer. That is all that is required to establish the materiality of the undisclosed evidence. *See Lay v. State*, 116 Nev. 1185, 14 P.3d 1256, 1263 (2000) (stating "specific evidence of the existence of another shooter" was potentially material because the defense "might develop reasonable doubt as to whether [the defendant] was the actual killer"). We do not think Harrington had to show, as the State argues, that the police reports would have "led to evidence that someone else committed [the] crime." It was incumbent on the State to prove Harrington's guilt beyond a reasonable doubt; it was not Harrington's responsibility to prove that someone else murdered Schweer. Therefore, if the withheld evidence would create such a doubt, it is material even if it would not convince the jury beyond a reasonable doubt that Gates was the killer.

Under the circumstances presented by the record before us, we cannot be confident that the result of Harrington's murder trial would have been the same had the exculpatory information been made available to him. We hold, therefore, that Harrington's due process right to a fair trial was violated by the State's failure to produce the police reports documenting their investigation of an alternative suspect in Schweer's murder. *See Mazzan*, 993 P.2d at 74–75 (finding *Brady* violation where withheld "police reports provided support for [the defendant's] defense that someone else murdered" the victim); *Davis v. Commonwealth*, 25 Va.App. 588, 491 S.E.2d 288, 293 (1997) (holding prosecution's failure to disclose information of other African–American females in vicinity of drug sale constituted a *Brady* violation). Accordingly, we reverse the trial court's contrary ruling, and remand this matter for entry of an order vacating Harrington's conviction and granting him a new trial.

**REVERSED AND REMANDED.**

All justices concur except CADY, J., who dissents, and LARSON, J., who takes no part.

CADY, Justice, (dissenting).

I respectfully dissent. Harrington's due process claim is not based on his pretrial lack of knowledge of a potential suspect who had been seen walking a dog and carrying a shotgun near the railroad tracks by the car dealership a few days prior to the murder. Furthermore, Harrington's claim is not that he did not have knowledge that dog prints were observed at the murder scene. If these were his claims, I would have no disagreement with the majority. Instead, his claim is that the police failed to turn over the written reports of their investigation into the potential suspect. Although suppression by the police of potentially exculpatory information can justify a new trial, it does not in this case because Harrington clearly knew enough about the information independent of the contents of the suppressed police reports to conduct his own investigation and determine its value as a defense.

I am outraged that the police, apparently, failed to turn over the questioned reports. This was a clear violation of *Brady*. However, due process does not require a new trial unless the suppressed reports would have reasonably altered the outcome of the trial. Although the passage of time, as well as the death of the defense attorney, has cast a cloud of vagueness over much of the trial proceedings, it is undisputed that Harrington and his attorney knew enough about the information contained in the suppressed police reports to examine witnesses at trial about the matter. Moreover, this information was so sensational and so exculpatory that Har-

rington's counsel surely would have earnestly pursued the matter independent of any police reports and then formulated a defense around it if it had been warranted. Consequently, I am unable to conclude that the reports would have altered anything at the original trial.

The majority cites two decisions to support its conclusion that the suppression of the reports denied Harrington the essential facts to structure a defense around the suppressed reports. *See Mazzan*, 993 P.2d at 37; *Wilson*, 2002 WL 732110, —— So.2d at ——. However, in *Mazzan* the actual police reports were essential to understanding and appreciating the implications of the information. Similarly, in *Wilson* defense counsel would have had no reason to "expend the time or resources" to locate the witness unless he would have known about the details of their testimony contained in the suppressed reports. In this case, however, there is no dispute that Harrington and his counsel had been made aware of the eerie, suspicious circumstances mentioned in the suppressed reports. Moreover, police did provide defense counsel with a report identifying the potential suspect by name, together with a host of names and addresses of neighbors who had seen the suspicious person. The suppressed police reports were not necessary to understand the significance of this known information or to prod any competent attorney to investigate every aspect of the information.

I believe the majority has attached too much significance to the suppression of the reports, and has elevated the circumstances implicating Gates as the murderer into a sensationalized claim that seemingly vindicates Harrington today, yet was known and rejected by police and Harrington's own defense counsel twenty-five years ago. The majority exalts the claim far beyond the significance anyone in-

volved in the case gave it twenty-five years ago, including Harrington's own defense counsel, whose competency was not questioned in this proceeding. The majority now sets aside a twenty-five year old jury verdict and places the State in the difficult position of retrying this case after the passage of two and one-half decades because of a misdeed by the police which, while disconcerting, did not result in prejudice to Harrington. I would conclude the *Brady* violation is not cognizable in this postconviction relief proceeding. I would otherwise affirm the district court ruling.