# IN THE COURT OF APPEALS OF IOWA

No. 18-0959
Filed June 5, 2019

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**JOHN MICHAEL ANCELL,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Bremer County, Peter B. Newell, District Associate Judge.

John Ancell appeals his convictions of domestic abuse assault causing bodily injury and possession of marijuana.  **AFFIRMED.**

Mark C. Smith, State Appellate Defender (until withdrawal), and Brenda J. Gohr, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Tyler J. Buller, Assistant Attorney General, for appellee.

Considered by Vogel, C.J., and Mullins and Bower, JJ.

**MULLINS, Judge.**

John Ancell appeals his convictions, following a jury trial, of domestic abuse assault causing bodily injury[1] and possession of marijuana. Ancell asserts the court erred in not granting him a new trial based upon the State's late disclosure of evidence, arguing that the late disclosure resulted in a violation of his rights to due process and a fair trial. Ancell also challenges the sufficiency of the evidence supporting the jury's verdicts.

## I.     Background Facts and Proceedings

Upon the evidence presented at trial, a rational jury could make the following factual findings. Ancell and K.E. met in 1997. At the time, K.E. lived in Cedar Falls and Ancell lived in Minnesota. They initiated a friendship but they drifted apart by the end of that year. K.E. messaged Ancell through social media in late 2008 or early 2009, and they resumed their friendship. At that time, K.E. had moved to Waverly and Ancell continued to have an apartment in Minnesota. Ancell also stayed with his parents at their farm in Oskaloosa. The relationship between Ancell and K.E. progressed to a romantic one. They began dating later in 2009.

For a majority of the relationship, K.E. and Ancell did not live in the same location. In mid-2016, K.E. purchased a home in Waverly. In August, Ancell began staying at the house. The time Ancell spent at K.E.'s house varied. He was a musician in a band and travelled to Des Moines at least once per week for practice.

---

[1] The trial information and the judgment entry identify the crime as "assault domestic abuse causing bodily injury." The jury instructions and verdict form use "domestic abuse assault causing bodily injury." We will use the latter throughout this opinion.

He would stay with friends in the Des Moines area during practice; otherwise, he spent a majority of the week at K.E.'s house. They spent time together, and while Ancell and K.E. did not always share a bed, the relationship was a sexual one. Ancell had a key to the house and was free to come and go as he pleased. He also kept clothing and personal items at the house. Ancell did not pay rent or utilities but made home improvements and repairs.

On the evening of May 19, 2017, Waverly police officers responded to a possible domestic dispute at K.E.'s house. When officers arrived, they heard raised voices from inside the residence. The officers made contact with both Ancell and K.E., speaking with them separately. K.E. told officers that she and Ancell had argued in the house and he prevented her from going downstairs. Ancell also poked her forcefully in the chest. After she started screaming, he grabbed her face by her mouth in order to quiet her. At some point, Ancell pushed K.E. down. While K.E. was on the floor, crying and screaming, Ancell sat or leaned on top of her with his knees on her chest. K.E. made the excuse of needing to use the restroom, at which point Ancell permitted her to do so. Once in the restroom, K.E. texted a friend, who then called the police. Officers noted marks on K.E.'s shoulder and jaw and observed her chest was red. Photographs were taken of K.E.'s neck, face, and upper-chest area.

Ancell told police that the argument was completely verbal and never escalated into a physical one. Both Ancell and K.E. described their relationship as a boyfriend-girlfriend one that had lasted about eight years. Ancell gave police a Minnesota driver's license but told them he was "pretty much living" at K.E.'s house.

Police arrested Ancell for domestic abuse assault and transported him to the Bremer County Law Enforcement Center. Before transport, a male officer patted Ancell down before putting him into the police car. When booked, Ancell gave K.E.'s address as his home address. At the jail's booking area, the arresting officer searched Ancell's belongings for a house key and debit card K.E. had asked to have returned. Ancell was present and his belongings were in a tote on the counter of the booking area. The officer asked Ancell which key was K.E.'s, and Ancell pointed out the correct one. The officer removed K.E.'s key from Ancell's key ring and then located and opened Ancell's money clip in order to find the debit card. Ancell again verified the officer had the correct card. Once the officer found the card, she placed all of the contents back into the clip and returned the clip to the tote with Ancell's belongings.

After verifying Ancell wished to speak without an attorney present, the officer interviewed Ancell. During the interview, Ancell offered adamant denials of hurting K.E. in specific ways without the officer asking him about specifics. When the officer did ask questions pertaining to K.E.'s particular accusations, such as preventing her from leaving or grabbing her face, Ancell answered that he did not know, could not recall, or was not sure. At the conclusion of the interview, the officer left Ancell with a blank form to fill out if he wished to provide a voluntary statement.

During an inventory search by jail personnel, a small, clear baggie with a substance was found in Ancell's money clip. Jail personnel opened the baggie

and, based on its odor, believed it to be marijuana.[2]   The arresting officer returned to the booking area and spoke with Ancell.  Ancell recognized the baggie and acknowledged that he knew it was marijuana and was in his property.  He told the officer that he had found the baggie and intended to throw it away.  Ancell was subsequently arrested for possession.

Ancell was charged by trial information with one count of domestic abuse assault causing bodily injury and one count of possession of a controlled substance—marijuana.  In August, the court granted Ancell's motion to produce, which asked for, among other things, "statements of the Defendant," including any written statements in the possession of the State; "all written or recorded statements, signed or unsigned confessions"; and "[a]ll materials known to the State, or which may become known, . . . which is exculpatory in nature or favorable to [Ancell]."

The case proceeded to trial in March 2018.  K.E. testified to the romantic nature of her relationship with Ancell, with Ancell spending most of his time at her house, though not on a consistent schedule.  She also testified about the incident between herself and Ancell.  She testified that it began as a verbal argument that escalated to a physical altercation, during which Ancell pushed her, grabbed her face to make her look at him, poked her, threatened to break her phone, raised his hand as if to hit her, prevented her from leaving, and pushed her down onto the floor.  While sitting on the floor, Ancell put his hand over her mouth to stop her from crying and screaming.  Ancell also pushed K.E. down to a supine position on the

---

[2] Laboratory tests later confirmed the substance was marijuana.

floor and kneeled on top of her with his knees on her chest. Eventually, she was able to retreat to the bathroom. She also testified that Ancell claimed that he had done something to her car to prevent her from leaving.

Ancell testified on his own behalf and reiterated that the argument between himself and K.E. was entirely verbal and never escalated to a physical altercation. He further testified that he did not live at K.E.'s house and did not consider it his permanent residence. He also denied making any statements admitting to recognizing the baggie and its contents or admitting it was in his possession. He contended the jailers were mistaken by believing the marijuana came from his property, highlighting that officials had grabbed a belt out of his property container and asked if it was his. He claimed the belt was not his and he was not wearing clothes in which a belt could be worn.

The arresting officer testified as to her actions on the night in question, including when she did not discover the baggie when she searched through Ancell's money clip in order to find K.E.'s debit card. She identified that she was not inventorying Ancell's belongings and was only searching for the debit card. She explained that she had her attention on Ancell for part of the search. She also testified to providing Ancell a blank voluntary statement form but by the end of her shift, it had not been returned to her. The statement was not returned to her at the time she wrote her police report. However, at some later point, it was returned.

Ancell's handwritten statement reads,

> [K.E.] and I were in a verbal argument. I do not believe that either of us were ever physical toward each other. I certainly would never harm [K.E.] for she is my best friend. Despite our argument I care for her very much. If [i]n any way I accidentally caused any injury to her I am truly and deeply sorry. But it was never intentional.

If she caused any injury to me I'm sure she also didn't mean to. I'm fine. We need to be able to be in communication for we are each other[']s only friends. Truly.

After presentation of the State's case-in-chief, and out of the presence of the jury, the prosecutor explained that she was under the mistaken impression that Ancell had never returned a written statement, due in part to the arresting officer's report, which stated no statement had been returned to her. After the officer's testimony made reference to the statement, she inquired further and discovered the statement. Once she became aware of the existence of the statement, she promptly alerted the defense and the court. She also explained that the officer would be available for testimony the next morning. The defense made no objection or motion. Instead, the defense expressed gratitude for the State's candor. The defense then proceeded on with its witness, Ancell himself. Ancell did mention the written statement in his testimony briefly but did not testify as to its contents. The written statement was not published to the jury or admitted into evidence. After Ancell's testimony concluded, the defense rested. Neither party mentioned the statement again, until Ancell's post-trial motions.

The jury returned verdicts finding Ancell guilty as charged. Post-trial, Ancell filed motions in arrest of judgment and for a new trial. He argued the State's late disclosure of Ancell's written statement was a *Brady*[3] violation resulting in the violation of his rights to due process and a fair trial. He further challenged the sufficiency of the evidence the State provided to prove material elements of both

---

[3] *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

charged offenses. Following a hearing, the court denied both motions. Ancell appealed following the imposition of sentence.

## II. Analysis

### A. Disclosure of Evidence

Ancell first asserts the district court erred in denying him relief on his claim that the State violated his due process rights by failing to disclose favorable evidence, constituting a *Brady* violation. He specifically argues the State failed to disclose his voluntary written statement he completed while in jail to the defense until the middle of trial. He contends this evidence was exculpatory and favorable to his defense. Further, he claims the statement could have been used to impeach witnesses and provide support to his alternative interpretation of the events of May 19, 2017. He argues the absence of the statement before trial hampered his ability to effectively prepare for trial. The State argues Ancell waived this issue by failing to request relief—whether a continuance, mistrial, or other relief—at the time the evidence was disclosed.

Ancell "was required to make timely objection to the State's lack of compliance." *See State v. Leto*, 305 N.W.2d 482, 489 (Iowa 1981). "The grounds of a motion for a new trial must stand or fall on exceptions taken at trial and a party cannot in a post verdict motion amplify or add new grounds as a basis for relief." *State v. Droste*, 232 N.W.2d 483, 488 (Iowa 1975). Ancell's objection to the late disclosure of the statement in his post-trial motions was too late. However, Ancell argues in the alternative that his trial counsel was ineffective in failing to object. Finding the record adequate to consider the claim, we will proceed to the merits.

Ineffective-assistance-of-counsel claims are reviewed de novo. *State v. Harrison*, 914 N.W.2d 178, 188 (Iowa 2018). Ancell must show "by a preponderance of the evidence both that counsel failed an essential duty and that the failure resulted in prejudice." *Id.* (quoting *State v. Schlitter*, 881 N.W.2d 380, 388 (Iowa 2016)). "[C]ounsel fails his or her essential duty by 'perform[ing] below the standard demanded of a reasonably competent attorney.'" *Id.* (quoting *Ledezma v. State*, 626 N.W.2d 134, 142 (Iowa 2001)). "[W]e begin with the presumption that the attorney performed competently" and "avoid second-guessing and hindsight." *Ledezma*, 626 N.W.2d at 142. Ancell "must demonstrate 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* at 143 (quoting *Strickland v. Washington*, 466 U.S. 668, 964 (1984)).

"To establish a *Brady* violation has occurred, [Ancell] must prove by a preponderance of the evidence '(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the issue of guilt.'" *DeSimone v. State*, 803 N.W.2d 97, 103 (Iowa 2011) (quoting *Harrington v. State*, 659 N.W.2d 509, 516 (Iowa 2003)). The nondisclosure of evidence is key to the determination of suppression, not the "good or bad faith of the [State]." *Id.* "Evidence is suppressed 'when information is discovered after trial "which had been known to the prosecution but unknown to the defense."'" *Harrington*, 659 N.W.2d at 522 (quoting *Cornell v. State*, 430 N.W.2d 384, 385 (Iowa 1988)). However, "'if the defendant either knew or should have known of the essential facts permitting him to take advantage of the evidence,' the evidence is not considered 'suppressed.'" *Id.* (quoting *Cornell*, 430 N.W.2d at 385).

Here, the alleged suppressed evidence is Ancell's own written statement. He had personal knowledge of the existence of the statement. Within the meaning of the *Brady* rule, the written statement was not suppressed. Further, the information contained in the statement was presented to the jury through the testimony of several witnesses. In the statement, Ancell claimed the argument with K.E. was a verbal one and that it was never physical. Ancell testified to this on his own behalf. Further, police officers testified that Ancell claimed throughout the investigation that the incident between Ancell and K.E. was entirely verbal.

Ancell is also unable to prove the statement was favorable to his defense. "Favorability in the context of *Brady* means that had the prosecution disclosed the suppressed evidence and had the defense used such evidence effectively, 'it [might have made] the difference between conviction and acquittal.'" *Moon v. State*, 911 N.W.2d 137, 145 (Iowa 2018) (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)). "The *Brady* rule encompasses both impeachment and exculpatory evidence." *Id.* Ancell argues that the statement could have been used to impeach the arresting officer's testimony by proving that a portion of her police report was incorrect and false. The arresting officer noted in her police report that Ancell's voluntary statement form was never returned. During the arresting officer's testimony, she testified that by the end of her shift on the night in question and at the time she was writing her report, the written statement had not been returned to her. However, she then explained that it was eventually returned to her, though she did not specify when. Further, while Ancell argues the statement would have provided support to his alternative interpretation of the events, as

discussed above, the same information was provided through Ancell's own testimony and the testimony of police officers.

Lastly, Ancell cannot prove that the statement was material. "Evidence is material when 'there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.'" *Harrington*, 659 N.W.2d at 523 (quoting *Cornell*, 430 N.W.2d at 386). In determining materiality, "the question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Id.* (quoting *Strickler v. Greene*, 527 U.S. 263, 290 (1999)). As stated, the information contained in the statement was presented to the jury through testimony of other witnesses, namely Ancell himself. We cannot say the statement could have put the case in a different light so as to undermine our confidence in the verdict. *See id.* Accordingly, Ancell's trial counsel was not ineffective as alleged.

B.      Sufficiency of the Evidence

Ancell also argues the court erred in denying his motion for judgment of acquittal based upon the sufficiency of the evidence. We review sufficiency-of-evidence challenges for correction of errors at law. *State v. Ramirez*, 895 N.W.2d 884, 890 (Iowa 2017). "[W]e will uphold a verdict if substantial evidence supports it." *Id.* "Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt." *Id.* (quoting *State v. Reed*, 875 N.W.2d 693, 704–05 (Iowa 2016)). "The evidence must do more than raise 'suspicion, speculation, or conjecture' regarding defendant's guilt." *State v. Randle*, 555 N.W.2d 666, 671 (Iowa 1996) (quoting *State v. Barnes*, 204 N.W.2d 827, 829 (Iowa 1972)). "We

consider all the record evidence, not just the evidence that supports the verdict." *State v. Biddle*, 652 N.W.2d 191, 197–98 (Iowa 2002).

### 1.    *Domestic Abuse Assault Causing Bodily Injury*

Ancell only challenges the State's establishment of one element as instructed: K.E. and Ancell were family or household members who resided together at the time of the incident.  Ancell argues that he and K.E. did not hold themselves out as husband and wife, did not share expenses or income, and did not share a bedroom.  He contends that while he had a key to K.E.'s residence, neither party considered the house to be Ancell's permanent residence.  Further, Ancell contends he and K.E. were not in a romantic relationship at the time of the incident and that the time they did spend together was limited, ranging from a few times per week to every few weeks.

"[W]hether two people were cohabiting is a question of fact for the jury." *State v. Virgil*, 895 N.W.2d 873, 881 (Iowa 2017).  In *State v. Kellogg*, the supreme court developed a list of nonexclusive factors a court or jury may use when determining whether parties "cohabitated":

> 1. Sexual relations between the parties while sharing the same living quarters.
> 2. Sharing of income or expenses.
> 3. Joint use or ownership of property.
> 4. Whether the parties hold themselves out as husband and wife.
> 5. The continuity of the relationship.
> 6. The length of the relationship.

542 N.W.2d 514, 518 (Iowa 1996) (quoting *People v. Holifield*, 252 Cal. Rptr. 729, 734 (1988)).  The court instructed the jury on these factors.[4]

Upon the evidence presented at trial, when viewed in the light most favorable to the State, the evidence was sufficient to support the jury's determination that Ancell and K.E. were cohabitating.  Ancell had keys to the house and spent the majority of his time there.  He self-identified that he was "pretty much living" at K.E.'s house.  He had possession of K.E.'s debit card.  Further, though Ancell did not pay rent, he "contributed in-kind services in the way of repairs and household duties."  *See In re Marriage of Harvey*, 466 N.W.2d 916, 918 (Iowa 1991).[5]  In sum, "The free and unlimited access that [Ancell] enjoyed to the home of [K.E.], as well as the nature of the relationship between the parties, establish that [K.E. and Ancell] had in fact cohabited."  *Id.*  Accordingly, we find the record contained substantial evidence to support the jury's guilty verdict for domestic abuse assault causing bodily injury.

### 2.    *Possession of a Controlled Substance—Marijuana*

To convict Ancell of possession of marijuana, the instructions required the State to prove: (1) Ancell "knowingly or intentionally possessed marijuana" and (2)

---

[4] The court defined "family or household members as persons cohabiting with each other." The court further instructed:

> "Cohabiting" does not require a sexual relationship, but does require more than dwelling or living together in the same place.  To determine if [Ancell] and [K.E.] were cohabiting at the time of the alleged offense, you may consider whether they had sexual relations while sharing the same living quarters; they shared income or expenses; they jointly used or owned property together; they held themselves out as husband and wife; the continuity and length of their relationship, and any other facts shown by the evidence bearing on their relationship with each other.

[5] Although *Harvey* construed the definition of cohabitation in a different context, the supreme court has viewed it as instructive on the issue of cohabitation in the domestic-abuse-assault context.  *See Kellogg*, 542 N.W.2d at 517.

Ancell "knew that the substance he possessed was marijuana." Ancell contests the first element, contending the State failed to provide sufficient evidence that he had knowledge or possessed the marijuana.

Here, multiple witnesses testified that once found, Ancell admitted he knew the substance was marijuana and knew the marijuana was in his property. Ancell denied making the statements and possessing the marijuana. The weight and credibility of the testimony of witnesses is left to the jury. *See State v. Allen*, 348 N.W.2d 243, 247 (Iowa 1984). Upon our review, we find the record contained substantial evidence for a rational jury to conclude Ancell knowingly or intentionally possessed marijuana.

## III.    Conclusion

Ancell's *Brady* claim fails on the merits. Accordingly, his trial counsel was not ineffective in failing to object to the State's late disclosure of his statement. We also find sufficient evidence to support his convictions. Therefore, we affirm Ancell's convictions for domestic abuse assault causing bodily injury and possession of marijuana.

**AFFIRMED.**